*In re* JUAN ORTIZ MARTÍNEZ, querellado.

*Número:* AB-2002-131 *Resuelto:* 6 de abril de 2004

*Roberto J. Sánchez Ramos*, procurador general; *Juan Ortiz Martínez*, querellado; *Dr. Humberto R. Vázquez Oliveras*, querellante.

PER CURIAM: El 17 de mayo de 2002 el Dr. Humberto R. Vázquez Oliveras presentó una queja bajo juramento ante la Secretaria de este Tribunal contra el Lcdo. Juan Ortiz Martínez. Expresó que en septiembre de 2001 fue citado por primera vez por el licenciado Ortiz Martínez, quien fungía como investigador y asesor legal de la Comisión de Salud de la Cámara de Representantes, que conducía una investigación sobre el Tribunal Examinador de Médicos de Puerto Rico. Acudió a la referida cita acompañado del Lcdo. José Colón Rodríguez. El interrogatorio que se le hizo lo dirigió el licenciado Ortiz Martínez como oficial de dicha comisión legislativa. Durante el curso de dicho interrogatorio y en respuesta a las preguntas formuladas, brindó información confidencial al licenciado Ortiz Martínez referente a los asuntos bajo investigación legislativa sobre el Tribunal Examinador de Médicos. Se reunió en tres ocasiones adicionales distintas en la oficina de la Comisión de Salud de la Cámara de Representantes de Puerto Rico con el Dr. Ángel García Colón, presidente de la referida comisión, y uno de sus asesores legales, el Lcdo. Luis Rodríguez.[1]

Alega que posteriormente, el 7 de mayo de 2002 a eso de las 9:15 de la mañana, acudió nuevamente a la oficina de la Comisión de Salud de la Cámara de Representantes, acompañado inicialmente del Lcdo. José Colón Rodríguez, donde fueron recibidos por la Directora Ejecutiva de dicha comisión legislativa, Sra. Inés Otero Figueroa. Inmediatamente después se presentó al lugar el licenciado Ortiz Martínez, asesor legal de esa comisión legislativa. Mientras éste último revisaba su ponencia escrita dirigida a esa

---

[1] El Dr. Humberto Vázquez Oliveras fue miembro del Tribunal Examinador de Médicos desde marzo de 1994 a septiembre de 1995. Desde esa fecha hasta el 29 de diciembre de 1999 fungió como Presidente de ese organismo. Desde esa fecha hasta febrero de 2000 actuó como tribuno del Tribunal Examinador de Médicos.

comisión, se unió al grupo la Lcda. Mirsonia Osorio, quien también lo acompañaba. Expresó que el licenciado Ortiz Martínez lo interrogó sobre su ponencia escrita y manifestó su criterio sobre varios asuntos allí contenidos.

Alegó que posteriormente conoció que el licenciado Ortiz Martínez, quien participaba activamente como oficial de la Comisión de Salud de la Cámara de Representantes en la investigación que se realizaba sobre el Tribunal Examinador de Médicos, era a su vez asesor legal de éste último. Adujo que tal situación "materializa un grave conflicto de interés al ser abogado de partes con intereses encontrados", y por tal razón presentó la queja ante nos.

El 20 de junio de 2002 referimos al Procurador General la queja para la correspondiente investigación e informe, a tenor con la Regla 14(d) de nuestro Reglamento, 4 L.P.R.A. Ap. XXI–A. El Procurador General rindió su informe el 16 de diciembre de 2002. El 14 de marzo de 2003 devolvimos el asunto al Procurador General para ampliar su investigación y rendir informe que debía ser acompañado con las declaraciones juradas de los testigos.

El 10 de junio de 2003 el Procurador General rindió un nuevo informe. Sostuvo que a base de su investigación y las declaraciones juradas de los testigos existe violación del querellado a los Cánones 21, 35 y 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX.

El 30 de junio de 2003 emitimos una resolución en la cual le concedimos al querellado un término para expresarse sobre el informe del Procurador General. El 9 de julio de 2003 el querellado compareció por escrito ante nos y admitió que, mientras participaba como asesor legal de la Comisión de Salud de la Cámara de Representantes de Puerto Rico en una investigación que ese organismo legislativo realizaba sobre el Tribunal Examinador de Médicos, otorgó otro contrato de servicios profesionales como asesor legal de éste último. Acompañó con su escrito una certificación de la Oficina de Finanzas y Presupuesto de la Cá-

mara de Representantes de Puerto Rico a los efectos de que trabajó para ese cuerpo legislativo, bajo contrato de servicios profesionales, adscrito a la oficina del Hon. Rafael García Colón desde julio de 2001 hasta el 23 de abril de 2002. Presentó, además, una certificación del Tribunal Examinador de Médicos a los efectos que comenzó a prestar servicios profesionales por contrato para esa dependencia de gobierno desde el 14 de marzo de 2002. De esta última surge que cuando el licenciado Ortiz Martínez solicitó ser considerado para prestar servicios profesionales al Tribunal Examinador de Médicos informó que estaba prestando servicios profesionales por contrato al Presidente de la Comisión de Salud de la Cámara de Representantes de Puerto Rico. Surge de ese documento, además, que el querellado nunca se le asignó ni intervino en el Tribunal Examinador de Médicos en ningún asunto relacionado con investigaciones de la Cámara de Representantes sobre esa entidad. El querellado admitió que prestó servicios profesionales a la vez como asesor legal de la Comisión de Salud de la Cámara de Representantes y del Tribunal Examinador de Médicos desde el 14 de marzo de 2002 hasta el 23 de abril de 2003. No obstante, afirma que a pesar de que de la evidencia presentada por el Procurador General surge una fuerte impresión de que medió un grave conflicto de intereses de su parte, la realidad es que contrario a la apariencia creada, en ningún momento el querellado incurrió en un conflicto real de intereses. Puntualizó que, al aceptar el contrato de servicios profesionales del Tribunal Examinador de Médicos, puso en conocimiento a esa entidad que tenía un contrato de servicios profesionales con la Comisión de Salud de la Cámara de Representantes.

El querellado aceptó que para el 7 de mayo de 2002, aunque ya no estaba trabajando para la referida comisión legislativa, estuvo presente en las oficinas de ese organismo legislativo y discutió aspectos de la ponencia escrita del Dr. Humberto Vázquez Oliveras con este último. Aun-

que catalogó de imprudente su proceder, le restó importancia, porque la información contenida en la ponencia escrita del doctor Vázquez Oliveras no contenía información confidencial. Puntualizó que de la investigación del Procurador General no surge evidencia alguna que demuestre que él haya incurrido en deslealtad hacia alguno de sus clientes, que haya representado intereses encontrados entre sus clientes o divulgado información confidencial en poder de alguno de ellos. Además, solicitó de este Tribunal la desestimación de la queja o, en alternativa, que consideremos lo expuesto por él como atenuante en vista de su buen expediente como abogado por espacio de once años.

## I

El Procurador General concluyó que el aquí querellado incurrió en violación al Canon 21 del Código de Ética Profesional, *supra*. Le asiste la razón. Veamos.

El Canon 21 del Código de Ética Profesional, *supra*, dispone lo siguiente:

> El abogado tiene para con su cliente un deber de lealtad completa. Este deber incluye la obligación de divulgar al cliente todas las circunstancias de sus relaciones con las partes y con terceras personas, y cualquier interés en la controversia que pudiera influir en el cliente al seleccionar su consejero. Ningún abogado debe aceptar una representación legal cuando su juicio profesional pueda ser afectado por sus intereses personales.
>
> *No es propio de un profesional el representar intereses encontrados. Dentro del significado de esta regla, un abogado representa intereses encontrados cuando, en beneficio de un cliente, es su deber abogar por aquello a que debe oponerse en cumplimiento de sus obligaciones para con otro cliente.*
>
> *La obligación de representar al cliente con fidelidad incluye la de no divulgar sus secretos o confidencias y la de adoptar medidas adecuadas para evitar su divulgación. Un abogado no debe aceptar la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior ni servir como árbitro, especialmente cuando el cliente*

*anterior le ha hecho confidencias que puedan afectar a uno u otro cliente, aún cuando ambos clientes así lo aprueban. Será altamente impropio de un abogado el utilizar las confidencias o secretos de un cliente en perjuicio de éste.*

Un abogado que representa a una corporación o sociedad le debe completa lealtad a la persona jurídica y no a sus socios, directores, empleados o accionistas y solamente puede representar los intereses de dichas personas cuando los mismos no vengan en conflicto con los de la corporación o sociedad.

Cuando un abogado representa a un cliente por encomienda de otra persona o grupo, quien le paga al abogado por dicho servicio, debe renunciar la representación de ambos tan pronto surja una situación de conflicto de intereses entre la persona o grupo que le paga sus honorarios y la persona a quien representa. (Énfasis suplido.)

■ El propósito esencial de la referida norma ética es reglamentar la conducta profesional que, de alguna forma, puede poner en peligro el principio de confidencialidad que caracteriza la relación fiduciaria de abogado-cliente y de esa forma menoscabar la imagen de la justicia y la confianza que el ciudadano tiene en el sistema.[2] El conflicto de intereses previsto con el Canon 21 del Código de Ética Profesional, *supra*, presenta tres situaciones que los abogados deben evitar, a saber: que en beneficio de un cliente se abogue por aquello a lo que el letrado debe oponerse en cumplimiento de sus obligaciones para con otro cliente; que un abogado acepte la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de un cliente anterior, y que un abogado acepte una representación legal o continúe en ella cuando su juicio pueda ser afectado por sus intereses personales.[3]

■ El Canon 21 del Código de Ética Profesional, *supra*, prohíbe la representación legal cuando existe la posibilidad de que el abogado incurra en conflicto de

---

[2] *In re Sepúlveda Girón*, 155 D.P.R. 345 (2001).

[3] Íd.; *In re Bonilla Rodríguez*, 154 D.P.R. 684 (2001); *In re Palou Bosch*, 148 D.P.R. 717, 724 (1999); *In re Toro Cubergé*, 140 D.P.R. 523 (1996).

intereses.[4] Hemos resuelto que existe un conflicto de intereses cuando hay alguna circunstancia que impide la representación libre y adecuada por parte del abogado y vulnera la lealtad absoluta que le debe todo abogado a su cliente.[5]

▆▆▆▆ Para determinar la existencia de un conflicto de intereses por razón de representación dual de un abogado de clientes con intereses encontrados, deberá utilizarse la formula de la relación sustancial entre los asuntos presentados por cada uno de los clientes a su abogado. No tiene que tratarse de asuntos idénticos o similares. Basta con que los asuntos de los que emane el conflicto que está vedado estén sustancialmente relacionados entre sí.[6] No puede aceptarse, por un abogado, la representación de un cliente en asuntos que puedan afectar adversamente cualquier interés de otro cliente anterior, independientemente de que ambos lo aprueben.[7] El Canon 21 del Código de Ética Profesional, *supra*, prohíbe tanto la representación concurrente como la sucesiva, siempre que exista una "relación sustancial" entre ambos asuntos que implica intereses adversos.[8]

▆▆▆▆ Al aplicar las disposiciones del Canon 21 del Código de Ética Profesional, *supra*, ante un planteamiento de representación sucesiva de clientes con intereses adversos, hemos resuelto que no tiene que demostrarse que de hecho ocurrió una violación al principio de confidencialidad. Sólo se requiere que se demuestre que el abogado mantuvo una relación de abogado-cliente con una persona que al tiempo

---

[4] *In re Sepúlveda Girón,* supra; *In re Soto,* 134 D.P.R. 772 (1993); *Pueblo v. Padilla Flores,* 127 D.P.R. 698 (1991); *In re Belén Trujillo,* 126 D.P.R. 743 (1990); *Sánchez Rodríguez v. López Jiménez,* 116 D.P.R. 172 (1985).

[5] *In re Morell, Alcover,* 158 D.P.R. 791 (2003); *In re Belén Trujillo,* supra.

[6] *In re Sepúlveda Girón,* supra.

[7] Íd.; *Otaño v. Vélez,* 141 D.P.R. 820, 826 (1996); *Fed. Pesc. Playa Picúas v. U.S. Inds., Inc.,* 135 D.P.R. 303 (1994).

[8] *P.R. Fuels, Inc. v. Empire Gas Co., Inc.,* 133 D.P.R. 112, 118-119 (1993); *In re Carreras Rovira y Suárez Zayas,* 115 D.P.R. 778 (1984).

presente tiene una controversia con otra persona que él representa; que la representación legal de su cliente anterior está sustancialmente relacionada con la representación profesional de su cliente actual, y que la representación legal actual resulta adversa a los intereses de su cliente original.[9]

■ Para determinar la situación de posible conflicto de intereses, en cualquiera de las situaciones antes indicadas, es indispensable tener en mente que la prohibición del Canon 21 del Código de Ética Profesional, *supra*, requiere no sólo la existencia real del conflicto, sino que se extiende igualmente a conflictos aparentemente existentes, pero que llevan consigo la semilla de un posible o potencial conflicto futuro. Es decir, está también vedado al abogado asumir la representación legal de clientes cuando resulta razonablemente anticipable un futuro conflicto de intereses, aún cuando sea inexistente al momento de la aceptación de la representación legal.[10]

Resulta imprescindible para que entre en vigor la prohibición sobre conflicto de intereses dispuesta en los cánones del Código de Ética Profesional, la existencia de una relación abogado-cliente dual sobre un asunto o tema.[11]

El querellado subscribió el contrato de servicios profesionales y consultivos Núm. 2002–000043 para brindar asesoría legal, legislativa, parlamentaria y administrativa a la Comisión de Salud de la Cámara de Representantes de Puerto Rico. Dicho contrato tenía una vigencia del 3 de julio de 2001 al 30 de junio de 2002. El contrato otorgado era para la prestación de servicios profesionales por el querellado a dicha comisión legislativa y a su presidente, Hon. Rafael García Colón.

---

[9] *Eliane Exp. Ltd. v. Maderas Alfa, Inc.*, 156 D.P.R. 532 (2002).

[10] *In re Sepúlveda Girón*, supra.

[11] *In re Avilés, Tosado*, 157 D.P.R. 867 (2002); *In re Bonilla Rodríguez*, supra; *In re Soto Cardona*, 143 D.P.R. 50 (1997).

El 2 de mayo de 2001 la Cámara de Representantes de Puerto Rico ordenó a su Comisión de Salud lo siguiente:

> ... realizar una investigación exhaustiva sobre el funcionamiento del Tribunal Examinador de Médicos de Puerto Rico incluyendo el proceso de revisión de exámenes de reválida, lista de aprobados, lista de suspendidos y lista de aprobados por revisión, hallazgos en auditorias del contralor, acreditación de universidades extranjeras, certificación de especialistas y otras funciones de su cargo.

Surge de las facturas por servicios profesionales prestados por el querellado a la Comisión de Salud de la Cámara de Representantes que éste trabajó directamente con la investigación que esa Comisión Legislativa realizaba sobre el Tribunal Examinador de Médicos. Los servicios profesionales prestados por el licenciado Ortiz Martínez en torno a dicha investigación, según surge de las facturas presentadas por éste, son las siguientes:

> *Julio 2001*
> Revisar la información recopilada en torno a las investigaciones que se están realizando en torno al Tribunal Examinador de Médicos (TEM) y del programa WIC del Departamento de Salud. ...
> Entrevistas a los Sres. Ramón Almodóvar y Levy Arroyo y a la Sra. Edna Morales respecto a la investigación realizada al TEM.
> Entrevistas al Sr. Francisco Acevedo y a la Sra. Jeannette Pérez respecto a la investigación realizada al TEM.
> Continuación del análisis de la información obtenida en las investigaciones que están efectuando, específicamente en torno a la información obtenida de una computadora relacionada con trabajos efectuados para el TEM.
>
> . . . . . . . . .
>
> *Agosto 2001*
> Revisar la información recopilada en torno a las investigaciones que se están realizando en torno al Tribunal Examinador de Médicos (TEM) y del programa WIC del Departamento de Salud. Establecer un plan de trabajo para el mes; informar al legislador sobre los hallazgos encontrados hasta el momento, redactar correspondencia para nuevas citaciones, preparación para comenzar vistas sobre la investigación del TEM.

Entrevistas a los Sres. Ramón Almodóvar y Levy Arroyo y a la Sra. Edna Morales respecto a la investigación realizada al TEM.

Entrevistas a la Sra. Elba Flores Villegas, Secretaria del TEM, respecto a la investigación realizada al TEM. Revisión del Reglamento del TEM.

Trabajo de investigación relacionado con los terrenos otorgados en usufructo al Hospital Grillasca de Ponce (Hospital Oncológico) para hacer recomendaciones en torno a [la] posibilidad de legislar para otorgarles título de propiedad a la organización que opera dicho hospital.

Entrevista a Sra. Ivonne M. Fernández Colón, exdirectora ejecutiva del TEM, y a Yolanda Rodríguez Torres, Recaudadora del TEM.

Entrevista al Lcdo. Pablo Valentín, Director Ejecutivo del TEM.

.　　.　　.　　.　　.　　.　　.　　.

*Septiembre 2001*

Revisar la información recopilada en torno a las investigaciones que se están realizando del Tribunal Examinador de Médicos (TEM) y preparación para las vistas públicas a celebrarse este mes. ...

Analizar varios documentos legales en las facilidades del TEM, escoger los documentos necesarios para nuestra investigación y hacerlos formar parte del expediente.

Entrevistas al Dr. García en relación a investigación del Programa WIC; revisar y organizar la información recopilada hasta el momento.

Entrevista al Dr. Humberto Vázquez respecto a la investigación realizada sobre el TEM, redacción de cartas y llamadas telefónicas para el comienzo de las vistas públicas, organización de la información recopilada para comenzar las vistas públicas.

Asistencia y asesoramiento en la primera vista pública en torno a la investigación efectuada al TEM. Anejo IV, págs. 26–32.

El querellado participó activa e intensamente en la investigación que realizaba la Comisión de Salud de la Cámara de Representantes de Puerto Rico sobre el Tribunal Examinador de Médicos. Obtuvo una gran cantidad de información de esa entidad; además, examinó un extenso número de documentos de ésta, incluyendo la revisión de su Reglamento. Entrevistó varios funcionarios y ex funciona-

rios de la entidad. Asistió y asesoró al Presidente de esa comisión legislativa en la primera vista pública celebrada en torno a la referida investigación.

De la cláusula novena del contrato de servicios profesionales otorgado entre el querellado y la Comisión de Salud de la Cámara de Representantes de Puerto Rico se desprende claramente la intención de ese cuerpo legislativo de que el querellado, como su abogado, no prestara servicios profesionales a otra dependencia de gobierno que pudiera presentar un conflicto de intereses. La cláusula novena del referido contrato dispone lo siguiente:

> Novena: Conflicto de Intereses: El Consultor certifica a La Cámara de Representantes que no presta servicios profesionales de asesoría bajo nombramiento o contrato en otra agencia, departamento, dependencia, oficina, negociado, administración, corporación pública o municipio del Estado Libre Asociado de Puerto Rico que constituya o represente un conflicto de interés al asumir posiciones contradictorias en los servicios a que se obliga a prestar bajo el presente contrato de servicios profesionales. *Exhibit* 2, Contrato de Servicios Profesionales y Consultivos Núm. 2002–000043 de 3 de julio de 20001, Cámara de Representantes, pág. 4.

De esa cláusula contractual se desprende claramente la obligación del querellado de no prestar servicios profesionales a ninguna dependencia de gobierno que constituya o represente un conflicto de interés. El 7 de marzo de 2002, el querellado otorgó un contrato de servicios profesionales y consultivos con el Departamento de Salud de Puerto Rico para ofrecer asesoría legal al Tribunal Examinador de Médicos con vigencia del 7 de marzo de 2002 al 30 de junio de 2002. Para la fecha cuando se otorgó el referido contrato, estaba vigente el contrato de servicios profesionales con la Comisión de Salud de la Cámara de Representantes. Al otorgar ese contrato con el Tribunal Examinador de Médicos, el querellado comenzó a trabajar con la dependencia de gobierno que estuvo investigando durante varios meses a tenor con el contrato vigente que mantenía con la Cá-

mara de Representantes. El querellado no informó de esa situación al Presidente ni a la Directora Ejecutiva de la Comisión de Salud del referido cuerpo legislativo. La carta de renuncia del querellado a sus funciones como asesor legal de la Comisión de Salud de la Cámara de Representantes y dirigida a su Presidente, Hon. Rafael García Colón tiene fecha de 10 de mayo de 2002. En dicho escrito el querellado señala que dio por terminado su contrato con la Comisión de Salud de ese cuerpo legislativo, retroactivamente al 23 de abril de 2002, y de que había informado al Presidente de la referida comisión legislativa que había otorgado el contrato de servicios profesionales con el Tribunal Examinador de Médicos. No obstante, lo declarado por la señora Otero, Directora Ejecutiva de la Comisión de Salud, lo contradice.

El querellado incurrió en violación a lo dispuesto en el Canon 21 del Código de Ética Profesional, *supra*. Otorgó un contrato de servicios profesionales con el Tribunal Examinador de Médicos estando vigente su contrato con la Comisión de Salud de la Cámara de Representantes y, mientras continuaba vigente la referida investigación legislativa sobre esa dependencia de gobierno. El querellado tenía acceso y obtuvo información privilegiada del Tribunal Examinador de Médicos como asesor de la Comisión de Salud de la Cámara de Representantes. Se personó a la oficina de la Directora Ejecutiva de la referida Comisión de Salud, en ocasión de que estaban llevando a cabo funciones propias de esa investigación legislativa. Intervino con un deponente a ser escuchado en vista pública y con sus abogados, todos ex funcionarios del Tribunal Examinador de Médicos, cuando ya éste trabajaba para este último. Su comportamiento dio la impresión al quejoso que para el 7 de mayo de 2002 éste trabajaba para esa comisión legislativa. Obtuvo una copia de la ponencia escrita que habría de vertir el doctor Vázquez Oliveras durante la celebración de la vista pública, le hizo preguntas al referido

galeno sobre ella y discutió con éste y sus acompañantes asuntos contenidos en ella, formulando criterio sobre algunos de ellos.

Es éticamente insostenible que un abogado ostente en realidad o en apariencia la representación simultánea o sucesiva de partes con intereses encontrados, o con un potencial conflicto de éstos. El conflicto de intereses no tiene que estar establecido claramente, pues basta con que sea potencial.[12] El cuadro fáctico que surge del informe del Procurador General y del escrito del propio querellado refleja claramente la presencia de un grave conflicto de interés de éste último.

## II

El Procurador General concluyó que el querellado incurrió en violación al Canon 35 del Código de Ética Profesional, *supra*. Le asiste la razón. Veamos:

■ El Canon 35 del Código de Ética Profesional, *supra*, dispone, en lo aquí pertinente, lo siguiente:

*Sinceridad y honradez*

*La conducta de cualquier miembro de la profesión legal ante los tribunales, para con sus representados y en las relaciones con sus compañeros debe ser sincera y honrada.*

*No es sincero ni honrado el utilizar medios que sean inconsistentes con la verdad ni se debe inducir al juzgar a error utilizando artificios o una falsa relación de los hechos o del derecho. Es impropio variar o distorsionar las citas jurídicas, suprimir parte de ellas para transmitir una idea contraria a la que el verdadero contexto establece u ocultar alguna que le es conocida.*

El abogado debe ajustarse a la sinceridad de los hechos al examinar los testigos, al redactar affidávit u otros documentos, y al presentar causas. El destruir evidencia documental o facilitar la desaparición de evidencia testifical en un caso es también altamente reprochable. (Énfasis suplido.)

---

[12] *In re Bonilla Rodríguez*, supra.

No es sincero ni honrado la utilización de medios que sean incompatibles con la verdad. Esta norma ética le impone a los abogados unas normas mínimas de conducta que sólo pretenden preservar el honor y la dignidad de la profesión.[13]

Todo abogado tiene la ineludible obligación de ajustarse a la fidelidad de los hechos. Ceñirse a la verdad va más allá que ocasionar perjuicio a tercero o deliberadamente defraudar o engañar. La verdad es un atributo inseparable de ser abogado y, sin ella, no podría la profesión jurídica justificar su existencia.[14]

No actuó con sinceridad el querellado al no informarle al Presidente y a la Directora Ejecutiva de la Comisión de Salud de la Cámara de Representantes de Puerto Rico que, estando vigente el contrato con ese cuerpo legislativo, otorgó otro contrato de servicios profesionales con el Tribunal Examinador de Médicos, organismo sujeto a investigación por esa comisión legislativa. Tampoco actuó con sinceridad el 7 de mayo de 2002 al no informarle, al deponente doctor Vázquez Oliveras, ex funcionario del Tribunal Examinador de Médicos y a los abogados que lo acompañaban que para esa fecha él era asesor legal de ese organismo, aclaración que él estaba obligado a hacer, pues dichas personas lo conocían como asesor legal de la Comisión de Salud de la Cámara de Representantes.

### III

El Procurador General concluyó que el querellado incurrió en violación al Canon 38 del Código de Ética Profesional, *supra*. Le asiste la razón. Veamos. El referido Canon 38, en lo pertinente, dispone lo siguiente:

---

[13] *In re Collazo Sánchez*, 159 D.P.R. 769 (2003); *In re Sepúlveda Girón*, supra; *In re Belk, Serapión*, 148 D.P.R. 685 (1999).

[14] *In re Montañez Miranda*, 157 D.P.R. 275 (2002); *In re Sepúlveda Girón*, supra; *In re Silvagnoli Collazo*, 154 D.P.R. 533 (2001); *In re Martínez Odell III*, 148 D.P.R. 636 (1999).

*Preservación del honor y dignidad de la profesión*
El abogado deberá esforzarse, al máximo de su capacidad en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia.

 La apariencia de conducta impropia puede resultar muy perniciosa con respeto de la ciudadanía hacia sus instituciones de justicia y a la confianza que los clientes depositan en sus abogados. La apariencia de conducta impropia o de conflicto de intereses puede tener un efecto tan dañino sobre la imagen, la confianza y el respeto del público por su Gobierno como la verdadera impropiedad ética. No obstante, este tipo de conducta impropia tiene que sostenerse sobre la apariencia que se da al público de la violación efectiva de alguno de los cánones del Código de Ética Profesional.[15] Ciertamente, la conducta del querellado constituye, en la realidad y en apariencia, una conducta impropia a tenor con el Canon 38 del Código de Ética Profesional, *supra*. Dicho comportamiento no sólo atentó contra la relación de fiducia y confidencialidad idónea de toda relación abogado-cliente, sino que también perjudicó el respeto y la confianza del pueblo en nuestro sistema de gobierno.

En el caso ante nos la conducta del querellado fue altamente impropia al otorgar un contrato de servicios profesionales con el Tribunal Examinador de Médicos, dependencia de gobierno que estaba investigando como asesor legal de la Comisión de Salud de la Cámara de Representantes. Fue impropia, además, la conducta del querellado al reunirse en la oficina de la Directora Ejecutiva de la Comisión de Salud de la Cámara de Representantes con el doctor Vázquez Oliveras y los abogados que lo acompañaban, examinar su ponencia, que era parte del proceso de la investigación en curso sobre el Tribunal Exa-

---

[15] *In re García Muñoz*, 160 D.P.R. 744 (2003); *In re Sepúlveda Giron*, supra; *In re Vélez Barlucea*, 152 D.P.R. 298 (2000).

minador de Médicos, ocultándoles a éstos que ya él era asesor legal de esa dependencia.

## IV

Por los fundamentos antes expuestos, procede que decretemos la suspensión inmediata del Lcdo. Juan Ortiz Martínez del ejercicio de la profesión de abogado por un término de tres meses, a partir de la notificación a las partes con copia de la sentencia a dictarse y hasta que otra cosa disponga este Tribunal. Le imponemos al querellado el deber de notificar a todos sus clientes de su presente inhabilidad de seguir representándoles, devolver cualesquiera honorarios recibidos por trabajos no realizados e informar oportunamente de su suspensión a los distintos foros judiciales y administrativos del país.

Deberá certificarnos, además, dentro del término de treinta días a partir de su notificación, el cumplimiento de estos deberes, notificando también de ello al Procurador General. El Alguacil de este Tribunal procederá a incautarse de la obra notarial del abogado Juan Ortiz Martínez, incluyendo su sello notarial, y los entregará a la Oficina de Inspección de Notarías para el correspondiente examen e informe a este Tribunal.

*Se dictará sentencia de conformidad.*