EN EL TRIBUNAL SUPREMO DE PUERTO RICO

| | |
|---|---|
| In re: <br><br> Gladys Fernández de Ruiz | 2006 TSPR 73 <br><br> 164 DPR _____ |

Número del Caso: CP-2003-16


Fecha: 21 de abril de 2006


Abogados de la Parte Querellada:

Lcda. Nydia María Díaz-Buxó
Lcdo. Luis E. Laguna Mimoso

Oficina del Procurador General:

Lcda. Minnie H. Rodríguez López
Procuradora General Auxiliar


Materia: Conducta Profesional
(La suspensión será efectiva el 2 de mayo de 2006 fecha
en que se le notificó a la abogada de su suspensión
inmediata.)

Este documento constituye un documento oficial del Tribunal
Supremo que está sujeto a los cambios y correcciones del proceso
de compilación y publicación oficial de las decisiones del
Tribunal. Su distribución electrónica se hace como un servicio
público a la comunidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Gladys Fernández de Ruiz          CP-2003-16

PER CURIAM

San Juan, Puerto Rico, a 21 de abril de 2006

El 2 de julio de 2003, el Procurador General de Puerto Rico radicó una querella contra la licenciada Gladys Fernández de Ruiz en la cual le formularon cuatro cargos por alegadas violaciones a la fe pública notarial y a los cánones 8, 18, 35 y 38 de Ética Profesional, 4 L.P.R.A. Ap. IX, C.8, 18, 35 y 38, respectivamente.[1] Específicamente, en la referida querellada se le imputó haber autorizado, como notario, una escritura sobre pagaré al portador, o a su orden, constituyendo una hipoteca sobre un inmueble, a

---

[1] La Lcda. Fernández de Ruiz fue admitida por este Tribunal al ejercicio de la abogacía el 21 de mayo de 1968 y al ejercicio del notariado el 10 de febrero de 1969.

sabiendas de que el documento era simulado y con el propósito de defraudar a un acreedor de su cliente, Carmen M. Abreu Rolón.[2]

De igual forma, se le imputó haber estado presente y haber participado en reuniones donde se llegaron a unos acuerdos que no se cumplieron --los cuales consistían en no gravar ni enajenar un inmueble propiedad de Abreu Rolón--

---

[2] Los procedimientos disciplinarios en el caso de epígrafe comenzaron, el 6 de noviembre de 2005, con la presentación de una queja ante este Tribunal por parte de Antonio Gómez Torres en contra de la Lcda. Fernández de Ruiz, por alegadamente no haberle informado (1) sobre la adjudicación de la liquidación de la sociedad legal de gananciales de Abreu Rolón y (2) sobre la autorización del otorgamiento de una escritura de hipoteca en garantía de un pagaré, aun cuando la abogada tenía conocimiento de una deuda ganancial existente como consecuencia de un caso de cobro de dinero, en el cual se emitió sentencia que era final y firme. A los fines de evaluar la queja presentada referimos este asunto a la Oficina de Inspección de Notarías.

En cumplimiento con la referida orden, el 10 de octubre de 1996 la Oficina de Inspección de Notarías nos sometió su informe, en el cual indicó que las mismas controversias estaban planteadas en un caso civil ante el Tribunal de Primera Instancia, Sala Superior de Guayama, Caso número EAC-95-326. En virtud de lo anterior, --y toda vez que consideraban que la queja planteaba una controversia de hechos y credibilidad que ameritaba oír testigos y aquilatar los testimonios-- dicha Oficina recomendó se refiriera el asunto al Procurador General para que diera seguimiento a las incidencias y resultados del aludido pleito civil radicado contra la Lcda. Fernández de Ruiz y tomara la acción que procediera. Examinado el referido informe, el 25 de octubre de 1996 suspendimos los procedimientos disciplinarios hasta que terminara el caso civil sobre el mismo asunto.

Posteriormente --finalizado el aludido caso y luego de que la Oficina de Inspección de Notarías sometiera un informe complementario-- este Tribunal le ordenó al Procurador General, mediante Resolución del 17 de enero de 2003, que procediera a formular la correspondiente querella disciplinaria.

induciendo a error a la otra parte para beneficio de su cliente.

Oportunamente, Fernández de Ruiz radicó la correspondiente contestación a la querella. En la misma negó la veracidad de todos los cargos imputados y, a su vez, solicitó la celebración de una vista evidenciaria, y que se declara sin lugar la querella.

En virtud de lo anterior, designamos a la Lcda. Ygrí Rivera de Martínez, ex Juez del Tribunal de Circuito de Apelaciones, como Comisionada Especial para que recibiera la prueba que presentaran las partes y rindiera un informe a este Tribunal con las determinaciones de hechos que entendiera procedentes. En cumplimiento con nuestra encomienda, el 30 de septiembre de 2005 la Comisionado Especial rindió su informe.

I

Del antes mencionado informe surge el trasfondo fáctico que exponemos a continuación. El 16 de octubre de 1985, Antonio Gómez Torres, su esposa Ignacia Zaragoza y la sociedad legal de gananciales compuesta por ambos presentaron--representados por el Lcdo. Samuel Gracia Gracia--ante el Tribunal de Primera Instancia, Sala Superior de Guayama, una demanda en Cobro de Dinero contra

su sobrino Mario Gómez Carrasquillo y su entonces esposa, Carmen Abreu Rolón.[3]

Luego de varios trámites e incidentes procesales, las partes presentaron una moción solicitando que el foro primario emitiera sentencia por estipulación de las partes. A través del referido acuerdo, el matrimonio demandado --representado por el Lcdo. José R. Cancio Vigas--se comprometía a satisfacer solidariamente la suma de $57,000, incluyendo el interés al 7.5% anual. De este modo, acordaron realizar pagos mensuales de $985.54 hasta saldar la aludida cantidad adeudada a Gómez Torres.

De igual forma, el referido matrimonio pactó que antes de disponer de sus bienes inmuebles se lo notificarían a Gómez Torres, incluyendo cualquier adjudicación que se hiciera por concepto de liquidación de la sociedad legal de gananciales constituida entre ambos.[4] Conforme a lo anterior, el 21 de diciembre de 1988 tribunal de instancia emitió sentencia aprobando el aludido acuerdo.

Posteriormente, el 29 de noviembre de 1990, el referido foro decretó el divorcio de Gómez Carrasquillo y Abreu Rolón. Durante este procedimiento la pareja estipuló todo lo relativo a sus bienes y obligaciones. En el caso de divorcio como en el proceso de liquidación y división de la

---

[3] Caso Civil Núm. CS85-1740.

[4] Asimismo, acordaron que en caso de que el mencionado matrimonio dejara de realizar los pagos mensuales durante más de dos plazos corridos, Gómez Torres podría acelerar el balance que se adeudara y solicitar la correspondiente ejecución de sentencia.

sociedad legal de gananciales, Abreu Rolón estuvo representada por Fernández de Ruiz.

El 30 de julio de 1991, el matrimonio otorgó una escritura sobre "Partición y Adjudicación de Bienes Gananciales" ante el Lic. Luis F. Camacho. Vale la pena destacar que antes del aludido otorgamiento--y en cumplimiento con lo acordado como parte del proceso de divorcio--el Lcdo. Camacho le envió por fax a Fernández de Ruiz el proyecto de escritura para su lectura y aprobación. Específicamente, la referida escritura desglosaba todos los bienes y deudas de la disuelta sociedad de gananciales. En lo aquí pertinente, entre el listado de las deudas, se encontraba la que tenía la pareja con Gómez Torres, la cual en ese momento ya estaba reducida a $40,000.

Como parte de la liquidación, Carrasquillo Gómez recibió un inmueble localizado en Cidra y, a su vez, asumió todas las deudas de la extinta sociedad legal de gananciales, relevando a Abreu Rolón de responder por cualquier deuda relacionada con la disuelta sociedad. Por su parte, Abreu Rolón recibió la casa en la que la pareja residía, ubicada en el Barrio Guavate, en Cayey. Es preciso señalar que aunque registralmente surgía que el matrimonio había gravado la referida propiedad mediante una hipoteca en garantía de un pagaré al portador o a la orden por $74,000, la realidad extraregistral era que la propiedad

estaba libre de cargas y gravámenes toda vez que al momento de liquidar la sociedad, esa deuda ya había sido saldada.[5]

Ahora bien, a pesar de lo acordado en el caso de Cobro de Dinero, el matrimonio nunca notificó a Gómez Torres sobre la adjudicación de los bienes en el procedimiento de divorcio. Transcurrido un tiempo --aun cuando efectuó varios pagos-- el 28 de septiembre de 1991 Carrasquillo Gómez dejó de efectuar los pagos mensuales acordados.

En virtud de lo anterior, el Lcdo. Gracia Gracia, siendo amigo de Fernández de Ruiz, al enterarse que ésta había representado a Abreu Rolón en el caso de divorcio se comunicó con ella en varias ocasiones para informarle sobre la existencia de la deuda ganancial de su cliente y Carrasquillo Gómez. Así pues, insistiendo en sus gestiones de cobro contra Abreu Rolón, el 15 de octubre de 1990 el Lcdo. Gracia Gracia le envió una carta a Fernández de Ruiz solicitándole que se comunicara con Abreu Rolón debido a que "[e]ntre los bienes gananciales exist[ía] una casa en la cual viv[ía] [s]u cliente y lamentaría mucho tener que embargar la misma".

Asimismo, el 25 de abril de 1991, el Lic. Gracia Gracia le cursó una segunda carta a Fernández de Ruiz,

---

[5] Esto quedó evidenciado por el hecho de que en el desglose de las deudas en la referida escritura de partición y liquidación nada se mencionó sobre esta deuda. A su vez, no hay duda que lo anterior era un hecho conocido por la pareja toda vez que como parte del procedimiento de divorcio el foro primario ordenó que Carrasquillo Gómez le entregara a Abreu Rolón el aludido pagaré de $74,000. No obstante lo anterior, como mencionamos posteriormente, Abreu Rolón no canceló ese gravamen hasta el 1993.

recordándole que había ido a su oficina donde le había comunicado el problema con el cobro de la aludida deuda y que, antes de solicitar la ejecución, estimaba necesario que ésta se comunicara con Abreu Rolón para ver en qué forma podían resolver el asunto. Nuevamente, mediante una tercera carta del 5 de junio de 1995, el Lic. Gracia Gracia volvió a mencionarle que era su deseo buscar un arreglo antes de ejecutar la sentencia.[6]

Así las cosas, el Lic. Gracia Gracia comenzó a notificarle a Fernández de Ruiz las mociones post-sentencia que radicaba en el caso sobre Cobro de Dinero. En lo aquí pertinente, el día 14 de agosto de 1992, radicó una moción bajo la Regla 51.4 de Procedimiento Civil, 32 L.P.R.A. Ap. III, R. 51.4, y, también, notificó copia de la misma al apartado postal de la Lic. Fernández de Ruiz. En dicha moción, además de indicarse una <u>exposición de los detalles de la sentencia en el caso de cobro de dinero</u>, se alegó que el matrimonio incumplió con la estipulación debido a que se divorciaron y liquidaron la sociedad legal de gananciales sin notificar a Gómez Torres y, además, porque no habían hecho más pagos, adeudando todavía la suma de $25,458.58.

En virtud de la referida moción, el foro primario expidió una orden de citación para que tanto Abreu Rolón como su ex-esposo Gómez Carrasquillo comparecieran a las

---

[6] La Lcda. Fernández de Ruiz señaló que no recibió las antes mencionadas cartas sin embargo éstas fueron enviadas al Apartado 426, en Caguas, <u>dirección de Fernández de Ruiz por más de treinta (30) años</u>.

oficinas del Lcdo. Gracia Gracia. En cumplimiento con lo ordenado, el 26 de octubre de 1992 Abreu Rolón compareció a la ofician del referido abogado, donde le entregó copia de la antes mencionada escritura de partición y liquidación para demostrar que Carrasquillo Gómez había asumido todas las deudas gananciales. En ese momento, por primera vez, Gómez Torres se enteró de la existencia de la aludida escritura.

Nuevamente, buscando un acuerdo que evitara la ejecución de la sentencia, el Lic. Gracia Gracia insistió con la Lic. Fernández de Ruiz y logró acordar una reunión entre las partes. <u>Ésta se efectuó en la oficina de la querellada, estando presentes el Lic. Gracia Gracia, la querellada, Gómez Torres y Abreu Rolón</u>.

En el entretanto, el 20 de abril de 1993, Abreu Rolón --mediante escritura otorgada ante Fernández de Ruiz-- canceló el pagaré de $74,000 que tenía en su posesión desde el procedimiento de divorcio. De igual forma, el 28 de septiembre de 1993, Abreu Rolón otorgó también ante Fernández de Ruiz un pagaré al portador o a su orden por $150,000, constituyendo una hipoteca en garantía de su pago sobre su propiedad en el Barrio Guavate, en Cayey, la cual había recibido en la liquidación de la sociedad legal de gananciales. Específicamente, <u>Abreu Rolón realizó esta transacción con el objetivo de "protegerse de sus</u>

acreedores".[7] Por tal razón, el referido pagaré nunca fue negociado. Vale la pena señalar que Fernández de Ruiz no instruyó a Abreu Rolón a que realizara el antes mencionado otorgamiento; ello no obstante, en ningún momento orientó legalmente a su cliente sobre las consecuencias de otorgar una escritura en posible fraude de acreedores.

Así las cosas, el 4 de octubre de 1993, Gómez Torres presentó ante el foro primario una solicitud de ejecución de sentencia para satisfacer el balance adeudado de la sentencia del caso de cobro de dinero, en específico desde el 28 de septiembre de 1991[8]. En la referida moción se expuso nuevamente que existía la aludida deuda y se indicaron los detalles de la estipulación; a saber que la deuda era solidaria, y que tanto Abreu Rolón como Gómez Carrasquillo tenían que notificarle a Gómez Torres cualquier disposición de sus bienes inmuebles. Esta moción también fue notificada a Fernández de Ruiz. Posteriormente, el 13 de octubre de 1993, el tribunal de instancia declaró con lugar la moción y ordenó que se procediera a vender en pública subasta la propiedad perteneciente a Abreu Rolón en el Barrio Guavate, en Cayey.

---

[7] Lo anterior surge de la transcripción de la deposición de Abreu Rolón del 16 de diciembre de 1998, página 15, líneas 17 a 20.

[8] La deuda en ese momento ya estaba reducida a $25,458.58 más el interés legal a razón de 7.50% anual desde el 28 de septiembre de 1991.

Teniendo ya la orden para vender en pública subasta la propiedad, el Lcdo. Gracia Gracia promovió una segunda reunión para darle otra oportunidad a Abreu Rolón. La referida reunión también se efectuó en la oficina de Fernández de Ruiz. En dicha reunión la querellada y su cliente no le informaron al Lcdo. Gracia Gracia sobre el otorgamiento del referido pagaré.

Así las cosas, en noviembre de 1994, toda vez que Abreu Rolón no pagaba, Gómez Torres le requirió su expediente al Lcdo. Gracia Gracia y, a su vez, contrató los servicios del Lic. Carlos Palmer Ramos para que continuara con el proceso de ejecución. Con ese propósito, el Lcdo. Palmer Ramos acudió al registro de la Propiedad y allí se enteró que la propiedad de Abreu Rolón había quedado gravada mediante hipoteca en garantía de un pagaré de $150,000. Por tal razón, éste le explicó a Gómez Torres que iba a ser difícil lograr su objetivo de cobrar la deuda. Asimismo, el 4 de enero de 1995, Gómez Torres se enteró que el 8 de noviembre de 1994 Abreu Rolón había cancelado el antes mencionado pagaré de $150,000 y, ese mismo día, había vendido su propiedad.

En virtud de lo anterior, el 26 de septiembre de 1995 Gómez Torres y su esposa Ignacia Zaragoza presentaron ante el Tribunal de Primera Instancia, Sala Superior de Guayama, una demanda sobre "Incumplimiento de Contrato, Daños y Perjuicios y Nulidad de Actuaciones" contra Carrasquillo Gómez, Abreu Rolón, Fernández de Ruiz, su esposo y la

sociedad legal de gananciales compuesta por ambos y Dioclesiano Delgado Rivera, que fue el comprador de la aludida propiedad.[9]

En la referida demanda se alegó, en síntesis, que el traspaso de la referida propiedad constituyó un fraude de acreedores siendo nula dicha transacción; que de haber actuado de buena fe Abreu Rolón y Fernández de Ruiz en las negociaciones y convenios realizados con la parte demandante, ésta hubiera podido embargar el inmueble de Abreu Rolón y cobrar la suma adeudada; que fue engañada de forma dolosa por la parte demandada quienes actuaron en mutuo acuerdo y concierto para defraudar a la parte demandante en sus acreencias; que la escritura del pagaré se otorgó con el deliberado propósito de defraudar a la parte demandante y evitar el embargo del inmueble mencionado; que el codemandado Gómez Carrasquillo responde solidariamente por la deuda pero se desconoce de bienes de éste que estén libres de cargas y gravámenes para poder cobrar el balance pendiente de la referida sentencia; y que se desconoce de bienes que estén inscritos a favor de Abreu Rolón.

Luego de varios trámites e incidentes procesales, el 26 de mayo de 1998 durante la celebración de un vista Abreu Rolón y Gómez Torres llegaron, en corte abierta, a un

---

[9] El referido caso tenía el número EAC-95-326. Asimismo, en virtud de lo acontecido Gómez Torres presentó la queja que dio comienzo a los procedimientos disciplinarios ante este Tribunal.

acuerdo transaccional a través del cual ella se obligó a pagar al demandante $39,779.03 por la parte de la sentencia pendiente de pago más intereses a razón del 6% anual, mediante pagos mensuales de $300.00. En virtud de lo anterior, el 11 de septiembre de 1998, el foro primario emitió sentencia parcial decretando el archivo de la acción contra Abreu Rolón.

Así las cosas, luego de que las partes desistieran de sus respectivas reclamaciones[10], el juicio se circunscribió a la acción de daños y perjuicios contra la Lic. Fernández de Ruiz, su esposo y la sociedad Legal de Gananciales compuesta por ambos. Posteriormente, el 6 de marzo de 2001 el foro primario emitió sentencia disponiendo finalmente del caso. El referido foro determinó que en efecto la Lic. Fernández de Ruiz había actuado ilícita, fraudulenta y/o dolosamente al autorizar una escritura de hipoteca de un pagaré al portador, autorizando la constitución de un gravamen hipotecario simulado. De esta forma, según señaló el tribunal de instancia, impidió la eventual ejecución de la sentencia y, como secuela, viabilizó la venta del inmueble en fraude de acreedores. A su vez, determinó que la querellada en su oficina y como representante legal de Abreu Rolón participó activamente en el acuerdo que ésta

---

[10] Durante los eventos procesales, la Lic. Fernández de Ruiz instó una demanda de tercero contra el Lic. Gracia Gracia quien, a su vez, contestó con una reconvención. Posteriormente, ambos desistieron de sus respectivas reclamaciones. De igual forma, Gómez Torres desistió de su reclamación contra Carrasquillo Gómez y Delgado Rivera.

reiteró de no gravar ni enajenar la propiedad sin previa notificación a Gómez Torres. No obstante lo anterior, resolvió no procedía la demanda toda vez que Gómez Torres no había presentado prueba alguna para establecer cuáles habían sido sus daños. Señaló que toda vez que no le correspondía hacer las determinaciones sobre la conducta antiética de los abogados, ordenó notificar una copia de la sentencia y, oportunamente, elevar una trascripción de la prueba ante este Tribunal, ante el cual se radicó una querella al respecto.

Informados de la sentencia emitida por el foro primario, el 11 de mayo de 2001 le concedimos un término de treinta días a Fernández de Ruiz para que expusiera lo que a bien tuviera sobre la determinación del referido foro a los efectos de que "la actuación de la Lcda. Fernández impidió una eventual ejecución de la sentencia y, como secuela, viabilizó la venta del inmueble en fraude de acreedores".

En cumplimiento con nuestra orden, el 19 de junio de 2001 Fernández de Ruiz presentó un escrito titulado "moción en cumplimiento de resolución incorporando memorando de autoridades". En la misma alegó, en síntesis, que entendía que divulgar las escrituras otorgadas por su cliente hubiese violado los cánones de ética notarial toda vez que el protocolo del abogado es confidencial y no puede ser difundido a terceros ni se puede entregar copia a persona alguna que no demuestre un interés legítimo en la misma;

que fue la insistencia de que se levantaran fondos para cubrir la deuda lo que motivó en gran medida la constitución de la hipoteca; que la propiedad estuvo muchos años libre de gravámenes y el Lcdo. Gracia tuvo conocimiento de lo anterior; que transcurridos cinco años nunca se solicitó la renovación de la sentencia conforme lo requiere la Regla 51.1 de las de Procedimiento Civil, ante; que, por el contrario, se utilizó como subterfugio para radicar una nueva demanda bajo incumplimiento de contrato y daños e incluir nuevas partes como la Lcda. Fernández de Ruiz; y que si alguien le debía deferencia al quejoso era su abogado el Lcdo. Gracia, quien no utilizó los procedimientos existentes en ley para asegurar el cobro de la deuda; a saber no hizo una anotación preventiva de demanda, de la sentencia ni de embargo.

Así las cosas, el 12 de marzo de 2002, a solicitud del Procurador General, le ordenamos a la Oficina de Inspección de Notarías para que emitiera un nuevo informe, toda vez que no había tenido el beneficio de la sentencia en el caso judicial por incumplimiento. Conforme a las determinaciones de hechos y conclusiones de derecho del foro primario en el referido caso, en su nuevo informe la Oficina de Inspección de Notarías concluyó que la conducta de Fernández de Ruiz constituía "una violación a los deberes que exigen la naturaleza de su función". En vista de ello, recomendó que se continuara el procedimiento disciplinario que fue paralizado contra Fernández de Ruiz,

que se refiriera el asunto al Procurador General para la radicación de la querella, y que se nombrara un comisionado para que recibiera la prueba y las defensas que Fernández de Ruiz había levantado a lo largo de todo este proceso.

Finalmente, el 1 de agosto de 2002, la Oficina de Inspección de Notarías presentó una moción sometiendo documentos adicionales e informe suplementario. En el mismo, señaló que al examinar la Certificación Registral de la Finca 7,325--que fue la finca que le tocó a Abreu Rolón luego de la división de gananciales--encontró que el día 14 de enero de 1994 <u>fueron presentados por el esposo de Fernández de Ruiz</u> cinco documentos en forma consecutiva en el Diario de Presentaciones 704. Los documentos fueron los siguientes: certificación de cancelar embargo a favor de E.L.A. de 22 de octubre de 1993, certificación para cancelar anotación de embargo del E.L.A. de 22 de octubre de 1993, cancelación de pagaré al portador de $74,000-- escritura de 20 de abril de 1993 ante Gladys Fernández de Ruiz, partición y adjudicación de bienes gananciales-- escritura de hipoteca en garantía de pagaré al portador núm. 28 de 28 de septiembre de 1993 ante Gladys Fernández de Ruiz. Específicamente, la oficina obtuvo copia certificada de dichos asientos de presentación y encontró <u>que la persona que retiró los documentos luego de presentados fue la abogada querellada</u>.

II

Como es sabido, los Cánones de Ética Profesional constituyen un compromiso constante para con la sociedad puertorriqueña. Éstos "enuncian los deberes de respeto y profesionalismo que debe[n] caracterizar a todo jurista y letrado en el desempeño de su trabajo frente a sus clientes y colegas ante todo foro en que ejerza". *In re Clavell Ruiz*, 131 D.P.R. 500, 508 (1992). Específicamente, hemos reiterado que los referidos Cánones aplican al abogado inclusive en su carácter de notario. *In re González Vélez*, res. el 16 de abril de 2002, 2002 T.S.P.R. 54; *In re Cardona Ubiñas*, res. el 15 de marzo de 2002, 2002 T.S.P.R. 48; *In re González Maldonado*, 152 D.P.R. 871, 895 (2000). En virtud de lo anterior, es indispensable que el jurista en el desempeño de su gestión notarial cumpla con lo dispuesto en la ley, en los Cánones de Ética o en el contrato con las partes. Ello es así, toda vez que la inobservancia de estos deberes lo expone no sólo a una acción en daños por los perjuicios causados, sino, a su vez, a las sanciones disciplinarias correspondientes. *In re González Maldonado*, ante; *In re Albizu Merced*, 136 D.P.R. 126, 131 (1994); *In re Vélez*, 103 D.P.R. 590 (1975).

En lo aquí pertinente, el Canon 8 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, recoge en esencia, el deber de todo abogado de no permitir --en su relación profesional-- que sus clientes incurran en conducta que resultaría impropia si éste la llevara a cabo

personalmente. Véase *In re Clavell Ruiz*, ante, a la pág. 509; véase, además, *In re Díaz Ruiz*, 149 D.P.R. 756, 760 (1999); *In re Rodríguez Feliciano*, res. el 14 de septiembre de 2005, 2005 T.S.P.R. 130. La referida prohibición es de tal importancia que el aludido Canon establece que cuando un cliente persiste en incurrir en tales actos indebidos el abogado debe terminar con él sus relaciones profesionales. *Ibid*.

Por otra parte, el Canon 18 de Ética Profesional, 4 L.P.R.A. Ap. IX, C.18, impone a los miembros de la clase togada la obligación de desempeñar la profesión cabal y responsablemente, particularmente con respecto a la tramitación de los asuntos que se le han encomendado. *In re Roldós Matos*, res. el 17 de marzo de 2004, 2004 T.S.P.R. 40. A tales efectos, "es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estime adecuada y responsable" *In re Alonso Santiago*, ante; véase, además, *In re Roldós Matos*, ante; *In re Flores Ayffan*, ante, a la pág. 913; *In re Maduro Classen*, 137 D.P.R. 426, 430-431 (1994); *In re Vela Colón*, 144 D.P.R. 581, 585 (1997); *In re Rivera Maldonado*, 143 D.P.R. 877, 879-880 (1997); *In re Vélez Valentín*, ante, a la pág. 408.

En vista de ello, este Tribunal ha señalado que los abogados tienen el deber "de defender diligentemente los intereses de su cliente con un trato profesional

caracterizado por la mayor capacidad, lealtad, responsabilidad, efectividad y la más completa honradez". *In re* Alonso Santiago, res. el 13 de septiembre de 2005, 2005 T.S.P.R. 137; véase, además, *In re* Flores Ayffán, 150 D.P.R. 907, 913 (2000); *In re* Vélez Valentín, 124 D.P.R 403, 408 (1989).[11] Ahora bien, hemos advertido que, aun cuando este precepto le impone taxativamente a los abogados la obligación de defender los intereses del cliente, esto no significa que puedan recurrir a violar las leyes o a cometer engaños para sostener su causa. Véase: *In re* Vélez Barlucea, 152 D.P.R. 298, 306 (2000); *In re* Díaz Ortiz, 150 D.P.R. 418, 426-427 (2000).[12]

A su vez, hemos establecido que, a pesar de que el antes mencionado Canon menciona que el abogado tiene que rendir una labor idónea de competencia y diligencia con

---

[11] El Canon 18, ante, establece, en lo aquí pertinente, que:

> Será impropio de un abogado asumir una representación profesional cuando está consciente de que no puede rendir una labor idónea competente y que no puede preparase adecuadamente sin que ello apareje gastos o demoras irrazonables a su cliente o a la administración de la justicia.
>
> Es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estima adecuada y responsable.

[12] Este Tribunal ha establecido que "la indiferencia, desidia, despreocupación, inacción y displicencia de parte de un abogado, como patrón de conducta en relación con asuntos encomendados por algunos clientes" constituye una violación a este Canon. *In re* Flores Ayffan, ante, a la pág. 913; *In re* Rivera Maldonado, ante, a la pág. 879.

relación a los asuntos de su cliente, <u>las aludidas</u> <u>exigencias se extienden a las funciones del jurista como</u> <u>notario</u>. Véase: *In re* González Vélez, ante; *In re* Cardona Ubiñas, ante; *In re* González Maldonado, ante; *In re* Martínez Ramírez, 142 D.P.R. 329, 340-341 (1997). Conforme a lo anterior, el notario debe, "con relación a los documentos que se otorgan ante él, ser diligente y desplegar en cada caso su más profundo saber y habilidad". *In re* Albizu Merced, ante, a las págs. 131-132.

Ello es así, toda vez que en nuestro ordenamiento jurídico el notario no es un "simple observador del negocio jurídico que ante él se realiza limitando su actuación a cerciorarse de la identidad de partes y autenticidad de las firmas". *In re* del Río Rivera y Otero Fernández, 118 D.P.R. 339, 347 (1989); *In re* Meléndez Pérez, 104 D.P.R. 770, 774-775 (1976). De este modo, hemos expresado que la función del notario, por ser pública y no privada, <u>trasciende a la de ser un autómata legalizador de firmas y</u> <u>penetra al campo de legalidad de la transacción concreta</u> <u>ante él</u>. *Ibid*.

En virtud de lo anterior, el notario no puede "limita[r] su intervención rutinaria a leer o dar a leer el documento a los otorgantes y asegurarse de la identidad de sus personas y firmas, en un ritual aséptico pero vacío de la inteligencia y comprensión de los firmantes". <u>*In re* del</u> <u>Río Rivera y Otero Fernández</u>, ante, a las págs. 347-348; véase, además, *In re* Cancio Sifre, 106 D.P.R. 386, 396-397

(1977). Todo lo contrario, el notario está obligado--como parte de su deber de información--a darle a los otorgantes "las informaciones, aclaraciones y advertencias necesarias de suerte para que comprendan el sentido, así como los efectos y consecuencias, del negocio, y se den cuenta de los riesgos que corren en celebrarlo". Chévere v. Cátala, 115 D.P.R. 432, 438 (1984). Ello en virtud de que "[l]a fe pública notarial tiene como base la voluntad ilustrada de los contratantes; no puede ser fruto de la ignorancia y la obscuridad". *In re* Díaz Ruiz, ante, a la pág. 759; *In re* Meléndez Pérez, ante, a las págs. 775-776.

Por su parte, el Canon 35 de los de Ética Profesional, 4 L.P.R.A. Ap. IX C.35, impone a los abogados "un deber de sinceridad y honradez ante los tribunales, frente a sus representados y al relacionarse con sus compañeros de profesión". *In re* Martínez, Lawrence Odell, 148 D.P.R. 49, 53 (1999); véase, además, *In re* Soto Colón, res. el 9 de noviembre de 2001, 2001 T.S.P.R. 166. A tales efectos, el referido Canon establece, en lo aquí pertinente, que no es sincero ni honrado el utilizar medios que sean inconsistentes con la verdad ni se debe inducir al juzgador a error utilizando artificios o una falsa relación de los hechos o del derecho. *In re* Silvaglioni Collazo, res. el 29 de junio de 2001, 2001 T.S.P.R. 106; véase, además, *In re* Aguila López, 152 D.P.R. 49, 52-53 (2000).

Con respecto a las obligaciones consagradas en este Canon, hemos expresado, en innumerables ocasiones, que las

mismas constituyen "normas mínimas de conducta que sólo pretenden preservar el honor y la dignidad de la profesión". *In re Ortiz Martínez*, res. el 6 de abril de 2004, 2004 T.S.P.R. 66; *In re Collazo Sánchez*, res. el 30 de junio de 2003, 2003 T.S.P.R. 128; *In re Montañez Miranda*, res. el 18 de junio de 2002, 2002 T.S.P.R. 122; *In re Soto Colón*, ante; *In re Criado Vázquez*, res. el 29 de octubre de 2001, 2001 T.S.P.R. 154. Por tal razón, el abogado no sólo debe observarlas durante un pleito, sino en toda faceta en la cual se desenvuelva. *In re Soto Colón*, ante; *In re Collazo Sánchez*, ante; In re Criado Vázquez, ante; *In re Belck Arce*, 148 D.P.R. 686, 691 (1999).

A esos efectos, hemos expresado que "[e]l compromiso de un abogado con la verdad debe ser siempre incondicional". *In re Montañez Miranda*, ante; *In re Guzmán Esquilín*, 146 D.P.R. 853, 859 (1998). Ello debido a que "[m]ás que un ideal irrealizable, la verdad es atributo inseparable del ser abogado y, sin ésta, no podría la profesión jurídica justificar su existencia." *In re Montañez Miranda*, ante; *In re Sepúlveda Girón*, res. el 24 de octubre de 2001, 2001 T.S.P.R. 153; *In re Martínez, Lawrence Odell II*, 148 D.P.R. 636, 641 (1999).

Este Tribunal ha expresado, reiteradamente, que se infringe el deber impuesto por el Canon 35, ante, "con el simple hecho objetivo de faltar a la verdad, lo cual supone una conducta lesiva a las instituciones de justicia,

independientemente de los motivos para la falsedad".[13] *In re Astacio Caraballo*, ante; véase *In re Belk Arce*, ante. Es decir, para incurrir en esta falta, <u>no</u> es necesario que se haya faltado a la verdad deliberadamente o de mala fe, con la intención de defraudar o engañar o que se haya producido un perjuicio a terceros. *In re Astacio Caraballo*, ante; véase, además, *In re Ortiz Martínez*, ante; *In re Montañez Miranda*, ante; *In re Sepúlveda Girón*, ante; *In re Martínez, Odell*, ante; *In re Chaar Cacho*, 123 D.P.R. 655 (1989); *In re Rivera Arvelo y Ortiz Velázquez*, ante.

De otra parte, el Canon 38 del Código de Ética Profesional, ante, "extiende la obligación de los abogados de conducirse en forma digna y honrada, a su vida privada".[14] *In re Quiñónez Ayala*, res. el 30 de junio de

---

[13] Hemos señalado, además, que "se infringe este deber deontológico con el hecho objetivo de faltar a la verdad en funciones propias de un abogado o cuando, actuando como ciudadano común, se pretende realizar actos o negocios de trascendencia jurídica". *In re Ortiz Martínez*, ante; *In re Montañez Miranda*, ante; *In re Sepúlveda Girón*, ante; *In re Martínez, Lawrence Odell II*, ante, a la pág. 641.

[14] El Canon 38, establece, en lo aquí pertinente que:

> El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradables pero que redundan en beneficio de la profesión…

**(Continúa . . .)**

2005, 2005 T.S.P.R. 99; *In re* Soto Colón, ante; *In re* Silvaglioni Collazo, ante.

Todo ello debido a que, "[l]a apariencia de conducta impropia puede resultar muy perniciosa al respecto de la ciudadanía por sus instituciones de justicia y por la confianza que los clientes depositan en sus abogados". *In re* Ortiz Martínez, ante; *In re* Sepúlveda Girón, ante. A tales efectos, hemos señalado que como "[c]ada abogado es un espejo en que se refleja la imagen de la profesión, éstos deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen". *In re* Quiñónez Ayala, ante; *In re* Silvaglioni Collazo, ante; *In re* Ortiz Brunet, 152 D.P.R. 542, 556 (2000); *In re* Coll Pujols, 102 D.P.R. 313, 319 (1974).

## III

En ocasiones anteriores, hemos expresado que este Tribunal no habrá de alterar las determinaciones de hechos del Comisionado Especial, salvo en aquellos casos donde se demuestre parcialidad, prejuicio o error manifiesto. *In re* Moreira Avillán, 147 D.P.R. 78, 86 (1991); *In re* Rivera Alvelo y Ortiz Velázquez, ante. En este caso, tras un examen sereno y minucioso del informe rendido por la antes

---

Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable…

mencionada Comisionada Especial, y la prueba que obra en el expediente, <u>no encontramos razón por la cual debamos intervenir con sus determinaciones fácticas</u>.

De entrada, es preciso señalar que aun cuando el tribunal de instancia en el caso de incumplimiento determinó que Gómez Torres no logró probar que sufrió daño alguno como consecuencia de las actuaciones de la querellada, <u>esto no significa que Fernández de Ruiz no haya incurrido en violaciones éticas</u>. Por el contrario, un examen de los hechos del presente caso demuestra que sus actuaciones, en efecto, constituyen violaciones tanto a la fe pública notarial como a los cánones 8, 18, 35 y 38 de ética profesional al no haber ejercido su profesión con sinceridad y honradez, autorizando el otorgamiento de un documento simulado con el objetivo de proteger a su cliente de sus acreedores.

No hay duda que--conforme las exigencias del antes mencionado Canon 18--el abogado tiene la obligación de desempeñar la profesión diligentemente inclusive en su función notarial. No obstante lo anterior, repetimos que esto no equivale a que el notario pueda llevar a cabo cualquier acto que considere conveniente para sostener las causas de su cliente. Así pues, un notario no puede adelantar los intereses de su cliente realizando actos fraudulentos y engañosos.

En específico, mediante el otorgamiento del pagaré de $150,000 Abreu Rolón admitió que lo que deseaba era

proteger su propiedad de sus acreedores. Esto, además, quedó evidenciado por el hecho de que el aludido pagaré nunca fue negociado y que el mismo día que se canceló se vendió la propiedad que gravaba. Ciertamente a través de su conducta, la querellada promovió que Abreu Rolón lograra el objetivo que se había propuesto. Es decir, mediante sus actuaciones Fernández de Ruiz sirvió de instrumento para que su cliente intentara escapar de su responsabilidad para con Gómez Torres.

Surge del expediente que al momento del otorgamiento la querellada conocía de la situación económica precaria que estaba atravesando Abreu Rolón, quien era una mujer divorciada con tres hijos menores, uno o dos de ellos estudiantes universitarios. Asimismo, tenía conocimiento de que el padre de los menores, Gómez Carrasquillo, no estaba proveyendo para su sostén. Sin lugar a dudas lo anterior es una situación lamentable. Sin embargo tales circunstancias no pueden servir de base para que un notario viole los cánones de ética profesional, convirtiéndose en un mero instrumento de sus clientes. No importa por lo que esté atravesando un cliente, el notario nunca puede olvidar que representa a la fe pública y no a ese cliente en particular. *In re* Díaz Ruiz, 149 D.P.R. 756, 759 (1999).

Ciertamente, la querellada queriendo ayudar a Abreu Rolón incumplió con la obligación incondicional de todo abogado con la verdad al otorgar un documento simulado que únicamente tenía el fin de preservar la propiedad en el

patrimonio de su cliente. Como hemos señalado anteriormente, "[l]o simulado, es sinónimo de falso y fingido, en esencia es contrario a la verdad; virtud que constituye el ideal más alto al cual debe aspirar en nuestra comunidad que se rige al amparo del imperio de la ley". *In re* Vélez, ante, a la pág. 598.

Como hemos señalado anteriormente, el notario no es un espectador silente que se limita a estar presente irreflexivamente en la ejecución del negocio jurídico que ante él se realiza. Éste tiene la obligación de velar porque todo lo autorizado, bajo su mano revestida por la fe pública, cumpla con lo requerida por la ley. *In re* González Maldonado, 152 D.P.R. 871, 926 (2000); lo cual cobra mayor importancia cuando el negocio autorizado trasciende más allá de los otorgantes. *Ibid*.

Conforme a lo anterior, Fernández de Ruiz tenía el deber de ilustrar y aconsejar a Abreu Rolón sobre el negocio que iba a llevar a cabo; teniendo conocimiento que el fin último de Abreu Rolón para realizar el otorgamiento era protegerse de sus acreedores, ésta nunca orientó a su cliente sobre la naturaleza fraudulenta de la transacción que estaba realizando.

Por otro lado, resalta el hecho de que Fernández de Ruiz indique que, al momento de autorizar la referida escritura, se había olvidado de la existencia de la deuda con Gómez Torres. A tales efectos testificó que "[e]n ese momento, le puedo decir con toda honestidad, que ni

recordaba la existencia de esa deuda". Como hemos reiterado, "los jueces no debemos, después de todo, ser tan inocentes como para creer declaraciones que nadie más creería". Pueblo v. Luciano Arroyo, 83 D.P.R. 573, 582 (1961). No hay duda de que, al momento del otorgamiento, la querellada tenía conocimiento no sólo de la existencia de la referida deuda sino, además, de la estipulación en el caso de cobro que establecía que cuando Abreu Rolón fuera a disponer de sus bienes tenía que notificárselo a Gómez Torres.

Si bien es cierto que la querellada no representó a Abreu Rolón en el caso de cobro de dinero no hay duda que conocía los detalles de la estipulación del referido caso; ello en virtud de que representó a Abreu Rolón en el pleito de divorcio y en la posterior partición y adjudicación de los bienes gananciales. Durante el referido procedimiento ésta leyó y aprobó la escritura de liquidación de los haberes gananciales otorgada ante el notario Luis F. Camacho, donde específicamente, entre el listado de deudas, se incluyó la deuda de $40,000 existente para con Gómez Torres. Asimismo, el licenciado Gracia Gracia le envió copia de las mociones postsentencia en el caso de cobro de dinero donde se expusieron los detalles no sólo de la deuda sino de la estipulación. Ciertamente la querellada incurrió en conducta que representa un pobre juicio profesional y serias faltas en la tramitación de su labor notarial.

Asimismo, demuestra ausencia del cuidado y el celo profesional que requiere la práctica notarial.

Por lo anteriormente expuesto, resolvemos que la Lcda. Fernández de Ruiz incumplió con los deberes que emanan de los Cánones 8, 18, 35 y 38 y, a su vez, violó la fe pública notarial. Tomando en consideración como atenuantes: que la querellada lleva más de tres décadas ejerciendo la profesión; que esta es la primera vez que incurre en una falta ética; que goza de una buena reputación en su comunidad y en el ámbito profesional; que no llevó a cabo sus actuaciones para lucro personal; y que Gómez Torres logró cobrar su acreencia, consideramos procedente limitar la acción disciplinaria a una suspensión por el término de un (1) mes del ejercicio de la abogacía y, naturalmente de la notaría en nuestra jurisdicción; apercibiéndola contra futuras infracciones éticas, en relación con las cuales seremos más severos.

Se dictará Sentencia de conformidad.

EN EL TRIBUNAL SUPREMO DE PUERTO RICO

*In re*

Gladys Fernández de Ruiz                    CP-2003-16

SENTENCIA

San Juan, Puerto Rico, a 21 de abril de 2006

Por los fundamentos expuestos en la Opinión Per Curiam que antecede, la cual se hace formar parte íntegra de la presente, se dicta Sentencia decretando la suspensión de Gladys Fernández de Ruiz del ejercicio de la abogacía y de la notaría en nuestra jurisdicción por el término de un (1) mes, contado el mismo a partir de la notificación de la presente Opinión y Sentencia. Se apercibe a ésta contra futuras infracciones éticas, en relación con las cuales seremos más severos.

Le imponemos a ésta el deber de notificar a todos sus clientes de su presente inhabilidad de seguir representándolos, les devuelva cualesquiera honorarios recibidos por trabajos no realizados, e informe oportunamente de su suspensión a los distintos foros judiciales y administrativos del País. Deberá, además, certificarnos dentro del término de treinta (30) días a partir de su notificación el cumplimiento de estos deberes, notificando también al Procurador General.

La Oficina del Alguacil de este Tribunal procederá, de inmediato, a incautarse de la obra notarial de Gladys Fernández de Ruiz, incluyendo su sello notarial, luego de lo cual entregará la misma a la Oficina de Inspección de Notarías para el correspondiente examen e informe a este Tribunal.

Así lo pronunció, manda el Tribunal y certifica la Secretaria del Tribunal Supremo.


Aida Ileana Oquendo Graulau
Secretaria del Tribunal Supremo