Opinión concurrente emitida por el
Juez Asociado Señor Rebollo López.
La conducta que da lugar a la presente acción disciplinaria tiene su génesis en una queja presentada ante este Tribunal por el Dr. Natalio Izquierdo y su esposa, la Sra. Vivian Amieiro, contra el Ledo. Andrés J. Colberg Trigo, por alegado incumplimiento con sus obligaciones como notario al autorizar una escritura de compraventa.(1)
En la queja, el referido matrimonio alegó, en síntesis, que el 10 octubre de 2002 compraron una propiedad ubicada en Miramar, San Juan, perteneciente a María del Carmen y María Arredondo Pérez.(2) Específicamente, señalaron que la transacción fue realizada a través de Home *110 Team, corredor de bienes raíces de la parte vendedora, y que la escritura de compraventa para adquirir dicha propiedad fue otorgada ante el licenciado Colberg Trigo. Argumentaron que ni el licenciado Colberg Trigo ni el corredor de bienes raíces, les notificaron antes de comprar la propiedad que estaba contaminada con asbesto y plomo. Indicaron que, luego de llevada a cabo la compraventa, y debido a que deseaban construir una casa más adecuada a sus necesidades, acudieron a la Administración de Reglamentos y Permisos (A.R.Pe.) para solicitar un permiso para demoler la mencionada propiedad. Señalaron que, al así hacerlo, se les notificó que para poder recibir dicha autorización debían realizar un estudio para la detección de materiales tóxicos en la propiedad. Indicaron que, al realizar el estudio, descubrieron que en algunas partes de la propiedad había asbesto y pintura a base de plomo en concentraciones tóxicas. En vista de esa situación, no sólo se retrasó la construcción de su nuevo hogar, sino que previo a comenzarla, tuvieron que incurrir en un gasto de más de $117,000 para mitigar y disponer de los referidos materiales tóxicos.
El matrimonio Izquierdo-Amieiro argumentó que había sido informado que los compradores de cualquier propiedad construida antes de 1978 tenían que ser notificados —ya fuera como parte de las advertencias pertinentes dentro de la escritura de compraventa o mediante una declaración de información sobre la pintura o peligros de la pintura a base de plomo— sobre la posibilidad de encontrar dichos materiales tóxicos en la estructura que iban a adquirir. Adujeron que, si antes de firmar la escritura de compraventa, el licenciado Colberg Trigo o el corredor de bienes raíces les hubiesen notificado lo anterior, hubieran tenido la oportunidad de tomar una decisión, informada e inteligente, en cuanto a la compra del inmueble. Por último, plantearon que la omisión en la notificación de la existencia de los aludidos materiales, de parte del licen *111 ciado Colberg Trigo, pudo haberse debido al parentesco de éste con las vendedoras del inmueble o a su falta de conocimiento sobre este aspecto.
Oportunamente, el licenciado Colberg Trigo presentó su oposición a la referida queja. Alegó, en síntesis, que en el antes mencionado otorgamiento cumplió a cabalidad con lo exigido por nuestro ordenamiento jurídico a través de la Ley Notarial de Puerto Rico, Ley Núm. 75 de 2 de julio de 1987 (4 L.P.R.A. see. 2001 et seq.), y del Reglamento Notarial de Puerto Rico, 4 L.P.R.A. Ap. XXIV. Argumentó que el notario no era un ingeniero o inspector de las propiedades objeto de una compraventa, por lo cual, desconociendo tal situación, no podía ser responsable por los materiales tóxicos presentes en éstas. A esos efectos, sostuvo que tal hipótesis sería una ampliación improcedente de lo que es la responsabilidad notarial y el ejercicio del notariado.
De otra parte, argumentó el licenciado Colberg Trigo que si la verdadera intención de los querellantes era demoler la propiedad en cuestión, pudieron haber sido más diligentes, antes de adquirirla, realizando las investigaciones necesarias para tal propósito. Asimismo, indicó que la compraventa del inmueble se realizó por un precio muy por debajo de la tasación y que los propios compradores acordaron que todas las reparaciones necesarias a la propiedad serían realizadas por su cuenta.
Señaló, además, el abogado que los compradores eran residentes de Miramar, razón por la cual debían conocer las residencias y la historia de dicha comunidad. Adujo, por otro lado, que de haber conocido las condiciones tóxicas de la propiedad, jamás hubiera guardado silencio al respecto. Cónsono con ello, destacó que de haber conocido tal situación no hubiera permitido que las vendedoras, siendo sus parientes, vivieran tantos años en una propiedad contaminada. Finalmente, aclaró que las vendedoras eran parientes suyos fuera del cuarto grado de consanguinidad, por lo que no existía contravención o impedimento *112 legal alguno para que él pudiera autorizar la antes mencionada escritura.
Referimos el asunto al Procurador General de Puerto Rico. Este presentó un informe con sus hallazgos y recomendaciones.(3) En dicho informe, el Procurador General indicó que, en su criterio, el licenciado Colberg Trigo había incurrido en violaciones a varios de los deberes impuestos a todo notario por nuestro ordenamiento jurídico; ello en vista de que incumplió con lo requerido por la Ley Federal para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales de 1992 ([Residential Lead-Based Paint Hazard Reduction Act of 1992), 42 U.S.C.A. sec. 4851 et seq. —pieza legislativa que, como profesional del Derecho, el licenciado Colberg Trigo tenía que conocer— al no incluir las advertencias que el referido estatuto federal requiere que contenga todo contrato de compraventa de una propiedad construida antes de 1978.
Específicamente, el Procurador General señaló que el aludido estatuto federal estableció varios requisitos con los cuales todo vendedor, arrendador o agente tenía que cumplir,(4) a saber: (1) divulgación a los compradores y arrendatarios de la presencia de pintura a base de plomo o de los peligros de ésta en viviendas construidas antes de 1978; (2) proveer a los compradores y arrendatarios un panfleto preparado por la Environmental Protection Agency (EPA, por sus siglas en inglés) que contiene información sobre la pintura a base de plomo, y (3) la concesión a los compradores de un periodo de diez días para que tuvieran la oportunidad de inspeccionar la propiedad. 42 U.S.C.A. sec. 4852d(l) *113 y (2). Dicho estatuto requiere, por otro lado, que en todo contrato de compraventa se incluya una aseveración específica con respecto a que efectivamente se cumplió con lo anterior. 42 U.S.C. sec. 4852d(2) y (3).
Indicó, además, el Procurador General que por mandato expreso de la referida pieza legislativa, el Departamento de la Vivienda y Desarrollo Urbano de Estados Unidos (HUD, por sus siglas en inglés) y la EPA promulgaron conjuntamente unas reglas específicas para asegurarse que los compradores y arrendatarios de viviendas construidas antes de 1978 recibieran toda la información necesaria para proteger a sus familias de los peligros de la pintura a base de plomo.(5) Conforme a dicho mandato, se aprobó la Regla de la Divulgación (Disclosure Rule), por medio de la cual se exige que todo contrato de compraventa incluya un anejo con la información siguiente: (1) un aviso sobre la peligrosidad del plomo y la obligación del vendedor de divulgar cualquier información al respecto; (2) una declaración del vendedor en la que divulgue su conocimiento sobre la presencia de pintura a base de plomo y cualquier información disponible al respecto, o que indique que carece de dicho conocimiento; (3) una lista de cualquier documento o informe entregado al comprador sobre la presencia de pintura a base de plomo en la residencia; (4) una declaración del comprador mediante la cual confirme el recibo de esta información; (5) una declaración del comprador en la que indique que se le ha otorgado la oportunidad de hacer una evaluación de riesgo de pintura a base de plomo o que ha renunciado a la evaluación; (6) si un agente representa al vendedor en la transacción, urna declaración de que ese agente está al tanto de su deber de asegurar el cumplimiento con lo anterior, y (7) la firma de todas las partes con la fecha en que firmaron. 24 C.F.R. see. 35.86.
Conforme a lo expuesto, el Procurador General señaló *114 que el licenciado Colberg Trigo, al autorizar una escritura de compraventa respecto a una propiedad construida en 1947 —edificación, naturalmente, anterior a 1978— tenía la obligación de incluir la aseveración y documentación exigida por la antes mencionada reglamentación federal.(6) Al no hacerlo, conforme señaló el Procurador General, éste incurrió en violaciones tanto a los Arts. 2 y 15 de la Ley Notarial de Puerto Rico, 4 L.P.R.A. sees. 2002 y 2033, como a los Cánones 35 y 38 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX. Específicamente, indicó el Procurador General que el licenciado Colberg violó: (1) el deber de darle a los otorgantes las informaciones, aclaraciones y advertencias necesarias para que comprendieran el sentido, así como los efectos y las consecuencias del negocio que iban a llevar a cabo, y se dieran cuenta de los riesgos que corrían al celebrarlo, y (2) el deber de asegurarse que el negocio jurídico que se efectuaba ante él cumplía con las formalidades de ley, tanto formales y como sustantivas.
Debe enfatizarse el hecho de que el Procurador General, en virtud de que este Tribunal nunca se ha expresado sobre este asunto, recomendó que se archivara la queja de autos y se impusiera prospectivamente el deber de todo notario de cumplir con la referida reglamentación federal.(7)
Hoy el Tribunal ordena el archivo y sobreseimiento de la queja presentada contra el licenciado Colberg Trigo. Estamos de acuerdo con dicho resultado; ello por los fundamentos que a continuación pasamos a exponer, los cuales lamentablemente una mayoría de los integrantes del Tribunal no apoyan.
*115 I
Como es sabido, “[l]a profesión de la abogacía está revestida de un alto interés público que requiere de una estricta observancia y reglamentación”. In re Montalvo Guzmán, 164 D.P.R. 806, 810 (2005). Particularmente, en su función como notarios, los abogados “tienen una gran responsabilidad con la fe pública notarial y una estricta obligación de cumplir cabalmente con la ley que regula sus funciones”. Id. Así pues, los notarios tienen el deber de llevar a cabo su función con cuidado, ejerciéndola con sumo esmero y celo profesional. In re Davison Lampón, 159 D.P.R. 448 (2003); In re González Maldonado, 152 D.P.R. 871, 926 (2000); In re Vera Vélez, 148 D.P.R. 1, 7 (1999); In re Torres Olmeda, 145 D.P.R. 384 (1998).
En armonía con lo anteriormente expresado, este Tribunal ha dicho que, en el ejercicio de su función, los notarios están obligados a cumplir rigurosamente con lo dispuesto en la Ley Notarial de Puerto Rico, con los cánones del Código de Ética Profesional y con el contrato entre las partes. In re Davison Lampón, ante. Véase, además, In re Aponte Berdecía, 161 D.P.R. 94 (2004); In re Vera Vélez, ante, pág. 7. De lo contrario, se exponen no sólo a una acción de daños por los perjuicios causados, sino, a su vez, a las sanciones disciplinarias correspondiente. In re Davison Lampón, ante; In re González Maldonado, ante, pág. 895; In re Vera Vélez, ante; In re Albizu Merced, 136 D.P.R. 126, 131 (1994); In re Vélez, 103 D.P.R. 590 (1975).
A. La Ley Notarial de Puerto Rico le impone al notario una función dual. Por un lado, el notario sirve como agente instrumental del documento notarial; por el otro, es un profesional del Derecho con el deber de asesorar y aconsejar legalmente a los otorgantes. In re Colón Rivera, 165 D.P.R. 148, 150 (2005), citando a In re Colón Ramery, 133 D.P.R. 555 (1993). Conforme a ello, la referida pieza legislativa establece una enumeración de las funciones inheren *116 tes que ejercerá todo notario en el descargo de su desempeño profesional. In re Avilés, Tosado, 157 D.P.R. 867 (2002).
Específicamente, y en lo aquí pertinente, el Art. 2 de la Ley Notarial de Puerto Rico, 4 L.P.R.A. see. 2002, consagra el principio de la fe pública notarial, y a esos efectos establece:
El notario es el profesional del Derecho que ejerce una función pública, autorizado para dar fe y autenticidad conforme a las leyes de los negocios jurídicos y demás actos y hechos ex-trajudiciales que ante él se realicen, sin peijuicio de lo dispuesto en las leyes especiales. Es su función recibir e interpretar la voluntad de las partes, dándole forma legal, redactar las escrituras y documentos notariales a tal fin y conferirle [s] autoridad a los mismos. La fe pública al notario es plena respecto a los hechos que, en el ejercicio de su función personalmente ejecute o compruebe y también respecto a la forma, lugar, día y hora del otorgamiento. (Corchetes en el original y énfasis suplido.)
Surge de la antes citada disposición, que el notario es el custodio de la fe pública, la cual, según hemos señalado, es “la espina dorsal de todo el esquema de autenticidad documental”. Feliciano v. Ross, 165 D.P.R. 649, 657 (2005). Véanse: In re Aponte Berdecía, ante; In re Rivera Vázquez, 155 D.P.R. 267 (2001); In re González Maldonado, ante; In re Jiménez Brackel, 148 D.P.R. 287 (1999); In re Peña Clos, 135 D.P.R. 590 (1994); In re González González, 119 D.P.R. 496 (1987). Conforme a lo anterior, el notario —siendo el conocedor del Derecho— al autorizar un documento “ ‘presuntamente da fe y “asegura que ese documento cumple con todas las formalidades de ley, formal y sustantivamente, que el documento es legal y verdadero, y que se trata de una transacción válida y legítima’ ”. In re González Maldonado, ante, pág. 895. Véanse, además: In re Aponte Berdecía, ante; In re Davison Lampón, ante; In re Rivera Arvelo y Ortiz Velázquez, 132 D.P.R. 840, 863 (1993); In re Feliciano Ruiz, 117 D.P.R. 269, 275 (1986). Así pues, hemos *117 establecido que, entre otras cosas, “la función del notario comprende el asegurarse de la legalidad de toda transacción que ante él se concreta”. In re Davison Lampón, ante, pág. 462. Véase In re Criado Vázquez, 155 D.P.R. 436 (2001).
Asimismo, y según establece el referido Art. 2, en dicha transacción el notario es quien recibe e interpreta la voluntad de los otorgantes, le da forma legal, redacta los documentos notariales a tal fin y les confiere autoridad. Véase In re Davison Lampón, ante, pág. 461 esc. 17. Cónsono con lo anterior, este Tribunal ha establecido que todo notario tiene cuatro deberes principales al autorizar una escritura pública, a saber: (1) indagar la voluntad de los otorgantes; (2) formular la voluntad indagada; (3) investigar sobre ciertos hechos y datos importantes, y (4) darles a los otorgantes las informaciones, aclaraciones y advertencias necesarias para que comprendan el sentido, así como los efectos y las consecuencias del negocio, y se den cuenta de los riesgos que corren en celebrarlo. Véanse: In re Davison Lampón, ante; Chévere v. Cátala, 115 D.P.R. 432 (1984).
En específico, hemos destacado una y otra vez la función del notario “de asesorar y advertir sobre los aspectos legales del instrumento que ante él se otorg[a] y que [éste] autoriza”. In re Colón Rivera, ante, pág. 151. A esos efectos, hemos indicado que en nuestro ordenamiento jurídico el notario no es un “ ‘simple observador del negocio jurídico que ante él se realiza limitando su actuación a cerciorarse de la identidad de partes y autenticidad de las firmas’ ”. In re Fernández de Ruiz, 167 D.P.R. 661, 677 (2006), citando a In re Del Río Rivera y Otero Fernández, 118 D.P.R. 339, 347 (1987). Véase In re Meléndez Pérez, 104 D.P.R. 770, 774-775 (1976). De este modo, hemos expresado que la función del notario, por ser pública y no privada, trasciende a la de ser un autómata legalizador de firmas y penetra al campo de legalidad de la transacción que se concreta ante él.
En virtud de lo anterior, el notario no puede “ ‘limita [r] *118 su intervención rutinaria a leer o dar a leer el documento a los otorgantes y asegurarse de la identidad de sus personas y firmas, en un ritual aséptico pero vacío de la inteligencia y comprensión de los firmantes’ In re Fernández de Ruiz, ante, págs. 677-678, citando a In re Del Río Rivera y Otero Fernández, ante, pág. 348. Véase, además, In re Cando Sifre, 106 D.P.R. 386, 396 (1977). Lo anterior implica que, “en su deber de ilustrar y dar consejo legal a las partes contratantes, no exista guardarraya que separe al notario del abogado”. In re Davison Lampón, ante, pág. 462. Véase In re Meléndez Pérez, ante, pág. 775.
Es más, este Tribunal ha ido más allá al “exigirle al notario que, en virtud del entrenamiento legal que posee, ejerza una función previsora frente a aquellos que ante él comparecen”. In re Davison Lampón, ante, pág. 462. Véase Rodríguez Sardenga v. Soto Rivera, 108 D.P.R. 733 (1979). Lo antes expuesto necesariamente significa que el notario no sólo debe conocer la norma —exigencia de todo jurista— sino que, además, debe saber interpretarla e integrarla en el plano general del ordenamiento jurídico que sólo el profesional del Derecho está en condiciones de hacer. In re Davison Lampón, ante; J.F. Delgado de Miguel, La fundón Notarial, II Rev. Jur. Not. 235 (1993). A tales efectos, he-mos sostenido que, como profesional del Derecho, el notario tiene la obligación no sólo de conocer, sino de mantenerse al día y seguir las leyes, la doctrina, las costumbres y la jurisprudencia. Véanse: In re Davison Lampón, ante; In re Feliciano Ruiz, ante, pág. 275.
Cónsono con el antes mencionado deber de ilustrar a los otorgantes para lograr que éstos concurran al acto notarial en un estado de conciencia informada, se encuentra la obligación de “ ‘cerciorarse de hacerles a las partes todas aquellas explicaciones, aclaraciones y advertencias necesarias para lograr el consentimiento informado de los otorgantes’ ”, el cual se establece en el Art. 15 de la Ley Notarial de *119 Puerto Rico.(8) Feliciano v. Ross, ante, pág. 659, citando a In re Pizarro Colón, 151 D.P.R. 94, 106 (2000). Véanse: In re Jiménez Brackel, 148 D.P.R. 287 (1999); Art. 15(f) de la Ley Notarial de Puerto Rico, 4 L.P.R.A. sec. 2033(f); S. Torres Peralta, El Derecho Notarial Puertorriqueño, San Juan, Pubs. STP, edición especial 1995, pág. 1.19. El referido deber, también, implica una gestión intelectual y una aplicación inteligente de los principios de derecho positivos y jurisprudenciales. In re Salas Davis, 145 D.P.R. 539, 544 (1998).
Dicha obligación cumple con el propósito de que los otorgantes comprendan el sentido, así como los efectos y las consecuencias, del negocio jurídico que van a llevar a cabo y se den cuenta de los riesgos que corren al celebrarlo. Véase: In re Fernández de Ruiz, ante; Chévere v. Cátala, ante, pág. 438. Lo anterior es requerido debido a que “ jija fe pública notarial tiene como base la voluntad ilustrada de los contratantes[, por lo cual] no puede ser fruto de la ignorancia y la obscuridad’ ”. (Enfasis en el original.) Chévere v. Cátala, ante, págs. 436-437. Véanse, además: In re Jiménez Brackel, ante, pág. 295; In re Meléndez Pérez, ante, pág. 776.
B. De otra parte, y como es sabido, los cánones del Código de Etica Profesional constituyen un compromiso constante para con la sociedad puertorriqueña. Estos “enuncian los deberes de respeto y profesionalismo que debe caracterizar a todo jurista y letrado en el desempeño de su *120 trabajo frente a sus clientes y colegas ante todo foro en que ejerza.” In re Clavell Ruiz, 131 D.P.R. 500, 508 (1992). En lo aquí pertinente, el Canon 18 del Código de Ética Profesional, 4 L.P.R.A. Ap. IX, impone a los miembros de la clase togada la obligación de desempeñar la profesión cabal y responsablemente, particularmente con respecto a la tramitación de los asuntos que le han sido encomendados. In re Roldós Matos, 161 D.P.R. 373 (2004). A tales efectos, “es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estime adecuada y responsable”. In re Alonso Santiago, 165 D.P.R. 555, 563 (2005). Véanse, además: In re Roldós Matos, ante; In re Flores Ayffán, 150 D.P.R. 907, 913 (2000); In re Vela Colón, 144 D.P.R. 581, 585 (1997); In re Rivera Maldonado, 143 D.P.R. 877, 879-880 (1997); In re Maduro Classen, 137 D.P.R. 426, 430-431 (1994); In re Vélez Valentín, 124 D.P.R. 403, 408 (1989).(9)
Específicamente, este Tribunal ha establecido que, a pesar de que el antes mencionado Canon 18 requiere que el abogado rinda una labor idónea de competencia y diligencia con relación a los asuntos de su cliente, las aludidas exigencias se extienden a las funciones del jurista como notario. Véanse: In re González Vélez, 156 D.P.R. 580 (2002); In re Cardona Ubiñas, 156 D.P.R. 340 (2002); In re González Maldonado, ante; In re Martínez Ramírez, 142 D.P.R. 329, 340-341 (1997). Conforme a lo anterior, el notario debe, “con relación a los documentos que se otorgan *121 ante él, ser diligente y desplegar en cada caso su más profundo saber y habilidad”. In re Albizu Merced, ante, pág. 132. Concretamente, hemos indicado que contraviene el Canon 18, ante, el notario que contraviene la ley vigente incurriendo en una práctica notarial indeseable, y aquel que en el descargue de su función deja de actuar con el cuidado, diligencia, tesón y responsabilidad que le compete en el ejercicio de su ministerio. In re Aponte Berdecía, ante; In re Rivera Arvelo y Ortiz Velázquez, ante; Torres Peralta, ante, pág. 4.28.
Por otra parte, el Canon 35 del Código de Etica Profesional, ante, impone a los abogados “un deber de sinceridad y honradez ante los tribunales, frente a sus representados y al relacionarse con sus compañeros de profesión”. In re Martínez, Odell I, 148 D.P.R. 49, 53 (1999). Véase, además, In re Soto Colón, 155 D.P.R. 623 (2001). A tales efectos, el referido Canon 35 establece, en lo aquí pertinente, que no es sincero ni honrado el utilizar medios que sean incompatibles con la verdad ni se debe inducir al juzgador a error utilizando artificios o una falsa relación de los hechos o del Derecho. In re Silvagnoli Collazo, 154 D.P.R. 533 (2001); In re Águila López, 152 D.P.R. 49, 52-53 (2000).
Con respecto a las obligaciones consagradas en el Canon 35, ante, hemos expresado en innumerables ocasiones que constituyen unas “normas mínimas de conducta que sólo pretenden preservar el honor y la dignidad de la profesión”. In re Ortiz Martínez, 161 D.P.R. 572, 587 (2004). Véanse: In re Collazo Sánchez, 159 D.P.R. 769 (2003); In re Montañez Miranda, 157 D.P.R. 275 (2002); In re Soto Colón, ante; In re Criado Vázquez, ante. Por tal razón, el abogado no sólo debe observarlas durante un pleito, sino en toda faceta en la cual se desenvuelva. In re Collazo Sánchez, ante; In re Soto Colón, ante; In re Criado Vázquez, ante; In re Belk Serapión, 148 D.P.R. 685, 691 (1999).
*122 Por su parte, el Canon 38 del Código de Ética Profesional, ante, extiende la antes mencionada “obligación de los abogados de conducirse en forma digna y honrada a su vida privada”.(10) In re Soto Colón, ante, pág. 648. Véanse: In re Quiñones Ayala, 165 D.P.R. 138 (2005); In re Silvagnoli Collazo, ante. Todo ello debido a que como hemos señalado que “[c]ada abogado es un espejo en que se refleja la imagen de la profesión”, éstos deben actuar con el más escrupuloso sentido de responsabilidad que impone la función social que ejercen. In re Coll Pujols, 102 D.P.R. 313, 319 (1974). Véanse: In re Quiñones Ayala, ante; In re Silvaglioni Collazo, ante; In re Ortiz Brunet, 152 D.P.R. 542, 556 (2000). Específicamente, este Tribunal ha establecido que otorgar un documento notarial en contravención de la Ley Notarial de Puerto Rico constituye una violación al Canon 38, ante. Véase In re Vera Vélez, ante.
II
De particular relevancia al presente caso resulta ser la Ley Federal para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales de 1992 (Residential Lead-Based Paint Hazard Reduction Act of 1992).(11) Dicho estatuto fue aprobado en 1992 por el *123 Congreso de Estados Unidos en respuesta a varios hallazgos sobre los efectos nocivos del plomo en el ser humano, particularmente en los niños menores de seis años.(12) 42 U.S.C.A. see. 4851. Véanse: Mason Ex Rel. Heiser v. Morrisette, 403 F.3d 28, 30 (1er Cir. 2005); National Multi Housing Council v. U.S. E.P.A., 292 F.3d 232, 233 (D.C.Cir.2002); Sweet v. Sheahan, 235 F.3d 80, 83-84 (2do Cir. 2000). Véanse, además: C.E. Walker, The Lead-Based Paint Real Estate Notification and Disclosure Rule, 8 Buff. Envtl. L.J. 65, 68 (2000); S.R. Cappell, Lead Paint Poisoning and the Resource Conservation and Recovery Act: A New Partnership for the Twenty-First Century, 35 (Núm. 3) Colum. J.L. & Soc. Probls. 175, 179 (2002).
La referida pieza legislativa se aprobó, entre otras, con la intención de establecer la infraestructura necesaria para reducir rápidamente los peligros de la pintura a base de plomo en las residencias y para enfrentar la necesidad de controlar la exposición de los ciudadanos a estos peligros. 42 U.S.C.A. sec. 4851a(l); Mason Ex Reí. Heiser v. Morrisette, ante, pág. 30; Sweet v. Sheahan, ante, pág. 84. Además, se aprobó con el objetivo de educar al público sobre los peligros y orígenes del envenenamiento por la pintura a base de plomo y sobre los pasos para poder reducir y eliminar estos riesgos. 42 U.S.C.A. sec. 4852a(7); Mason Ex Reí. Heiser v. Morrisette, ante, pág. 30.
Específicamente, se dispuso que las residencias o viviendas objeto de la legislación (target housing) eran, como *124 regla general, aquellas propiedades construidas antes de 1978.(13) 42 U.S.C.A. sec. 4851b(27); 24 CFR see. 35.86; 40 CFR see. 745.103. Ello en vista de que ese fue el año en que la Comisión para la Seguridad de los Productos de Con-sumo (Consumer Product Safety Commission) prohibió el uso de la pintura a base de plomo. National Multi Housing Council v. U.S. E.P.A., ante, pág. 233. Véanse: C.E. Walker, ante, pág. 71; K.A. Pancak et al., Legal Duties of Property Owners Under Lead Based-Paint Laws, 24 Real Est. L. J. 7, 8 (1995); N.M. Kublicki, Heavy Metal: Residential Lead Rule, 10 Prob. & Prob. 38, 40 (septiembre-octubre 1996).
De otra parte, se excluyeron de la aplicación de esta legislación: (1) viviendas para personas de edad avanzada (a menos que resida o se espere que resida un niño menor de seis años); (2) viviendas para incapacitados; (3) viviendas de 0 cuartos, y (4) alojamiento comercial. Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9066; J.P. Fensler y L.A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, ante, pág. 16; Kublicki, ante, pág. 40.(14)
*125 Para lograr los objetivos de esta medida se requirió, en lo aquí pertinente, que la EPA y HUD promulgaran una regulación conjunta para asegurar que los compradores y arrendatarios de viviendas objeto de la legislación estuvieran recibiendo toda la información necesaria para proteger a su familias de los peligros de la pintura a base de plomo. 42 U.S.C.A. sec. 4852d(a)(l); Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9064; National Multi Housing Council v. U.S. E.P.A., ante, pág. 233; Sweet v. Sheahan, ante, pág. 84; J.P. Fensler y L.A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, 26 Real Est. L.J. 7 (1997); Kublicki, ante, pág. 39.
Ahora bien, y no obstante haber requerido lo anterior de las referidas agencias, mediante el mencionado estatuto el Congreso estableció unos parámetros con respecto a qué tipo de información tenía que ser divulgada a todo comprador o arrendatario de una propiedad construida antes de 1978, antes de que estuviera obligado por un contrato de compraventa o arrendamiento.(15) A esos efectos, se exigió que los vendedores y arrendadores proveyeran al comprador o arrendatario un folleto informativo preparado por la EPA sobre los peligros del plomo(16) y les divulgaran su conocimiento sobre la presencia de pintura a base de plomo o de sus peligros en la propiedad, proveyéndoles cualquier informe o evaluación que tuvieran disponible. 42 U.S.C.A. *126 sec. 4852d(a)(l). Particularmente, a los vendedores de dichas propiedades se les requirió que le proveyeran a los prospectos compradores un período de diez días —o aquel período que mutuamente acordaran para que tuvieran la oportunidad de realizar una inspección o evaluación para la detección de los peligros de la presencia de pintura a base de plomo en la residencia objeto de venta. 42 U.S.C.A. sec. 4852d(a)(l).(17)
Es preciso señalar que el vendedor tiene que cumplir con lo anterior antes de aceptar la oferta del prospecto comprador, ello con el propósito de que el prospecto comprador tenga la oportunidad de revisar la información y posiblemente enmendar la oferta. Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9071. De este modo, se le notifica al prospecto comprador sobre la posibilidad de que estén presentes en la propiedad los riesgos de la pintura a base de plomo, ofreciéndole la oportunidad para rechazar la transacción o para proceder a realizar el contrato de compraventa con el conocimiento de que existe la posibilidad de que dichos peligros pueden estar presentes en la propiedad que va a adquirir. Mason Exel. Heiser v. Morrisette, ante, pág. 31.
Es de notar que a los agentes de los vendedores y arren *127 dadores se les impuso, a su vez, la responsabilidad de asegurarse de que sus clientes cumplieran con los requisitos de divulgación y notificación establecidos por la ley. 42 U.S.C.A. sec. 4852d(a)(4). Los agentes pueden cumplir con esta obligación informando a los vendedores o arrendadores de sus obligaciones y asegurándose que las actividades son completadas, ya sea por el vendedor o arrendador o llevándolas a cabo personalmente.(18) Luego de que el agente ha informado al vendedor o arrendador de sus obligaciones de divulgación según dicho estatuto, el agente no será responsable por aquella información que el vendedor o arrendador le haya escondido. 24 CFR see. 35.94; 40 CFR see. 745.115; Lead; Requirements for Disclosure of Known Lead-Based Paint and!or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9077; Walker, ante, pág. 75; Fensler y Bernstein, ante, pág. 15; Kublicki, ante, pág. 41.
De otra parte, mediante el mencionado estatuto se exigió que todo contrato de compraventa incluyera un anejo constatando que se cumplieron con los antes mencionados requisitos de divulgación. A tales efectos, específicamente, se requirió que en una hoja de papel aparte —en letra grande y en el mismo idioma del contrato— se incluyera una Declaración de Advertencia de Pintura a Base de Plomo (Lead *128 Warning Statement).(19) Asimismo, se requirió que dichos contratos incluyeran una aseveración del comprador certificando que había leído la referida declaración, que había recibido el panfleto de la EPA y que tuvo la oportunidad de realizar una inspección a la propiedad antes de estar contractualmente obligado con el vendedor. 42 U.S.C.A. see. 4852d(a)(2); Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064—01, 9064—9065; Mason Ex Rel. Heiser v. Morrisette, ante, pág. 31; Cudjoe Ex Rel. Cudjoe v. Dept. of Veterans Affairs, 426 F.3d 241, 245 (3er Cir. 2005); Sweet v. Sheahan, ante, pág. 84; Pancak et al., ante, pág. 15; Kublicki, ante, págs. 40-42; Cappell, ante, pág. 180.
En específico, se establecieron, además, penalidades y sanciones significativas por incumplir con los requisitos de divulgación y notificación de la mencionada pieza legislativa. Mason Ex Rel. Heiser v. Morrisette, ante, pág. 31. Fensler y Bernstein, ante, pág. 17; Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064—01, 9077. A tales efectos, se autorizó a la EPA y a HUD a imponer penalidades civiles monetarias por cada violación a la ley. Más aún, se dispuso que todo vendedor o arrendador que, a sabiendas, violara las disposiciones de la ley resultaría responsable civilmente por hasta el triple de la cuantía de los *129 daños causados al comprador, más las costas y los honorarios de abogado. 24 CFR see. 35.96; 40 CFR see. 745.118; Lead; Requirements for Disclosure of Known Lead-Based Paint and!or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9065. Ahora bien, expresamente se dispuso que el incumplimiento con las disposiciones de la ley no autorizaba a la rescisión del contrato o ala creación de un defecto en el título de la propiedad. 24 CFR see. 35.98; 40 CFR see. 745.119; Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9078.
Así pues, en virtud del antes mencionado mandato y conforme a los parámetros establecidos por dicho estatuto, en 1996 la EPA y la HUD aprobaron sus regulaciones con-juntas, mejor conocidas como la Regla de la Divulgación(20) (Disclosure Rule). 24 CFR see. 35, según codificado por la HUD; 40 CFR sec. 745, según codificada por la EPA.(21) Mediante la referida regla se dispuso específicamente qué información debía ser divulgada y cuál era el lenguaje que todo contrato de compraventa debía contener a esos efectos. De esta forma, se impuso la obligación se certificar y acreditar que se cumplieron con los requisitos de divulgación impuestos por el antes mencionado estatuto.
Se requirió de este modo que todo contrato de compraventa de una propiedad construida antes de 1978 incluyera en el idioma del contrato un documento anejado con los elementos siguientes: (1) la Declaración de Advertencia de Plomo (Lead Warning Statement)', (2) una aseveración del vendedor para divulgar su conocimiento sobre la presencia *130 de pintura a base de plomo o de sus peligros en la vivienda, o para indicar su desconocimiento de la presencia de éstos; (3) uno aseveración del vendedor de que ha entregado al comprador una lista de los informes o evaluaciones que tiene disponibles o para indicar que no los tiene; (4) un acuse de recibo del comprador que afirme que ha recibido toda la información antes mencionada y el folleto informativo de la EPA sobre los peligros del plomo; (5) una aseveración del comprador de que tuvo un periodo de 10 días (o el periodo acordado entre las partes) para realizar una evaluación o inspección de los peligros de la pintura a base de plomo en la propiedad o, en la alternativa, una aseveración de que ha renunciado a su derecho de realizarla; (6) cuando hay un agente involucrado en la transacción, tiene que incluirse una afirmación de que éste le informó al vendedor su obligación de cumplir con la regla de divulgación y que es consciente de su deber de asegurarse del cumplimiento con los requerimientos de esta regla y, por último, (7) debe incluirse la fecha y la firma del vendedor y del agente, y el comprador con la que certifiquen la exactitud de las aseveraciones en el anejo. 24 CFR see. 35.92; 40 CFR see. 745.113; Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9072-9073; Pancak et al., ante, pág. 16.(22)
*131 Por último, las referidas agencias impusieron la obligación al vendedor, y al agente, de retener copia de este documento por un periodo no menor de tres años desde la fecha de la venta de la propiedad. 24 CFR see. 35.92; 40 *132 CFR sec. 745.113; Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9076; Fensler y Bernstein, ante, pág. 20.
Ill
De entrada, es preciso señalar que aun cuando la Ley para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales de 1992 expresamente establece que el incumplimiento con sus disposiciones no vicia el título ni conlleva la anulación del contrato de compraventa, ello no significa, como bien señala el Procurador General, que el licenciado Colberg Trigo no haya incurrido en violaciones éticas.(23) Por el contrario, un examen de los hechos del presente caso demuestra que su conducta constituyó una violación tanto a los Arts. 2 y 15 de la Ley Notarial de Puerto Rico como a los Cánones 18, 35 y 38 de nuestro Código de Ética Profesional, al no ejercer su profesión con cuidado, diligencia y celo profesional cuando autorizó una escritura de compraventa sin cumplir con lo requerido por dicha ley federal.
El licenciado Colberg Trigo alega que requerir el cumplimiento con las disposiciones del aludido estatuto equivale a una aplicación improcedente de lo que es la responsabilidad notarial y el ejercicio del notario. Nada más lejos de la verdad. Como mencionamos anteriormente, y conforme a su deber de asesorar a las partes, el notario —como profesional del Derecho— tiene la responsabilidad de mantenerse al día con respecto a las leyes que inciden sobre su función notarial. Ello en vista de que “el notario no es un espectador silente que se limita a estar presente *133 irreflexivamente en la ejecución del negocio jurídico que ante él se realiza. Este tiene la obligación de velar por que todo lo autorizado, bajo su mano revestida por la fe pública, cumpla con lo requerido por la ley”. (Enfasis suplido.) In re Fernández de Ruiz, ante, pág. 26. Véase In re González Maldonado, ante.
De igual forma, “[l]a fe pública notarial le impone al notario el deber de ser diligente en su gestión y de asegurarse de cumplir con todas las solemnidades de ley al autorizar instrumentos públicos”. (Corchetes en el original.) Feliciano v. Ross, ante, pág. 657. Véase, también, In re Rivera Vázquez, ante. Así pues, no hay duda que al aplicar en nuestra jurisdicción dicha ley federal, el licenciado Col-berg Trigo, como parte de su función como notario, estaba obligado a conocerla y a cumplir con sus disposiciones.

Ciertamente, el antes mencionado estatuto federal y su reglamentación afecta y cubre las transacciones de bienes raíces en Puerto Rico, exigiendo que los vendedores, arrendadores o sus corredores o vendedores de bienes raíces divulgaran a los prospectos compradores o arrendatarios información adicional sobre sus propiedades. Asimismo, y en lo aquí pertinente, específicamente impuso unos requisitos con respecto a los contratos de compraventa, requiriendo que se incluyera un anejo con un lenguaje específico.

Somos del criterio que el licenciado Colberg Trigo estaba obligado —como parte de su deber de asesorar a los otorgantes y de cerciorarse de hacerles las explicaciones necesarias para que éstos comprendieran los efectos y las consecuencias del negocio jurídico que estaban llevando a cabo— a cumplir con lo requerido por dicha pieza legislativa, incluyendo las aseveraciones, las advertencias y la documentación requerida por la reglamentación federal.
En el presente caso, el licenciado Colberg Trigo no anejó documento alguno al contrato de compraventa ni se cercioró que en efecto se le hubiese divulgado la información con respecto a los peligros de la pintura a base de plomo a *134 los prospectos compradores, habiendo sido construida la propiedad objeto de la compraventa antes de 1978. Al no hacerlo, no desplegó su función de notario con cuidado y diligencia, por lo que incurrió en una violación a los Cá nones 18, 35 y 38 del Código de Ética Profesional, ante. El licenciado Colberg Trigo tampoco se aseguró que el documento que ante él se otorgaba cumpliera con todas las formalidades de ley, formales y sustantivas, en violación a los Arts. 2 y 15 de la Ley Notarial de Puerto Rico, ante.
Debe mantenerse presente que es deber de un notario “ilustrar y explicarle la situación a todas las partes envueltas en la transacción; en específico, a los compradores de la propiedad”. (Enfasis suplido.) In re Delgado, 120 D.P.R. 518, 526 (1988). Véase In re Jiménez Brackel, ante, pág. 295. Ello brinda la oportunidad a éstos de tomar la decisión que entiendan procedente, estando debidamente informados. íd. El licenciado Colberg Trigo, al no cumplir con esta obligación, permitió que el matrimonio Izquierdo-Amieiro otorgara una escritura de compraventa sin comprender los riesgos y las consecuencias del negocio jurídico que estaba llevando a cabo. Así pues, se convirtió en coautor de un consentimiento enfermo, traicionando de esta forma la fe de la que es principal guardador. Véase In re Meléndez Pérez, ante, págs. 776-777. Surge de lo anteriormente expuesto que, con su conducta, el licenciado Colberg Trigo incurrió en violaciones éticas al no cumplir con lo exigido por la Ley para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales de 1992.
Considerando que los hechos en el presente caso no son únicos y que, por el contrario, se puede tratar de una situación recurrente en perjuicio de nuestros conciudadanos, resolveríamos que todo notario que otorgue en nuestra jurisdicción una escritura de compraventa sobre una propiedad residencial inmueble, construida antes de 1978, debería realizar las aseveraciones y advertencias pertinentes y *135 anejar el documento requerido por la Ley para la Reducción de los Riesgos Provocados por la Pintura a Base de Plomo en Viviendas Residenciales de 1992. Ello no obstante, y siendo la primera vez que este Tribunal se expresa con respecto a la obligación antes mencionada, entendemos razonable la recomendación del Procurador General de que esta norma sea aplicada de forma prospectiva.
Concurrimos, por los fundamentos antes expresados, con la Sentencia mayoritaria que ordena el archivo y sobreseimiento de la queja presentada contra el Ledo. Andrés J. Colberg Trigo.

 El Ledo. Andrés J. Colberg Trigo fue admitido al ejercicio de la abogacía el 25 de enero de 1999 y al ejercicio del notariado el 10 de junio de 1999.

 Surge de una tasación, que consta en el expediente de autos, realizada a dicha propiedad el 23 de septiembre de 2002 que el inmueble fue construido en 1947.

 En su informe, el Procurador General se limitó a discutir el planteamiento de los quejosos a los efectos del deber que como notario tenía el licenciado Colberg Trigo de realizar las advertencias con respecto a que la propiedad objeto de la compraventa estaba contaminada con plomo.

 Vale la pena señalar que para efectos de dicho estatuto, agente significa aquella parte que contrata con un vendedor o arrendador con el propósito de vender o arrendar las residencias sujetas a la ley, a saber, como regla general, aquellas construidas antes de 1978. 24 C.F.R. see. 35.86.

 En específico, Puerto Rico forma parte de la Región 2 de la Environmental Protection Agency (EPA).

 Al llegar a la referida conclusión, el Procurador General destacó que aun cuando por disposición expresa del aludido estatuto federal, el incumplimiento con las disposiciones de dicha ley no anulaba el negocio jurídico de la compraventa, esta situación no descartaba la responsabilidad de todo notario de cumplir con los requisitos del estatuto.

 En vista de que en el presente caso no existe controversia alguna sobre los hechos, no hubo necesidad de designar un Comisionado Especial para que recibiera la prueba que tuvieran a bien presentar las partes y nos rindiera un informe. In re Davison Lampón, 159 D.P.R. 448 (2003); In re Irizarry, González, 151 D.P.R. 916, 918 (2000).

 A tales efectos, el Art. 15 de la Ley Notarial de Puerto Rico, 4 L.P.R.A. see. 2033, establece, en lo aquí pertinente:
“La escritura pública, en adición al negocio jurídico que motiva su otorgamiento y sus antecedentes y a los hechos presenciados y consignados por el notario en la parte expositiva y dispositiva contendrá lo siguiente:
“(f) El haberles hecho de palabra a los otorgantes en el acto del otorgamiento las reservas y advertencias legales pertinentes. No obstante, se consignarán en el documento aquellas advertencias que por su importancia deban, a juicio prudente del notario, detallarse expresamente.”

 El Canon 18 del Código de Ética Profesional, 4 L.P.R.A. Ap. EX, establece, en lo aquí pertinente, que:
“Será impropio de un abogado asumir una representación profesional cuando está consciente de que no puede rendir una labor idónea competente y que no puede prepararse adecuadamente sin que ello apareje gastos o demoras irrazonables a su cliente o a la administración de la justicia.
“Es deber del abogado defender los intereses del cliente diligentemente, desplegando en cada caso su más profundo saber y habilidad y actuando en aquella forma que la profesión jurídica en general estima adecuada y responsable.”

 El Canon 38 del Código de Ética Profesional establece, en lo aquí pertinente, que:
“El abogado deberá esforzarse, al máximo de su capacidad, en la exaltación del honor y dignidad de su profesión, aunque el así hacerlo conlleve sacrificios personales y debe evitar hasta la apariencia de conducta profesional impropia. En su conducta como funcionario del tribunal, deberá interesarse en hacer su propia y cabal aportación hacia la consecución de una mejor administración de la justicia. Tal participación conlleva necesariamente asumir posiciones que puedan resultarle personalmente desagradables pero que redundan en beneficio de la profesión ....
“Por razón de la confianza en él depositada como miembro de la ilustre profesión legal, todo abogado, tanto en su vida privada como en el desempeño de su profesión, debe conducirse en forma digna y honorable.” 4 L.P.R.A. Ap. IX.

 La referida pieza legislativa fue codificada en el Título X de la Ley de Vivienda y Desarrollo de Comunidades (Housing and Community Development Act of 1992), Pub. L. No. 102-550, 106 Stat. 3672 (1992).

 A través de esta ley, el Congreso reconoció que el envenenamiento por plomo era una amenaza para los niños menores de seis años y enfatizó en las necesidades de esta población vulnerable. 42 U.S.C.A. see. 4851. Véase, además, Lead; Requirements for Disclosure of Known Lead-Based Paint and I or Lead-Based Paint Hazard in Housing, 61 FR 9064—01. Específicamente, se descubrió que, en bajos niveles, el envenenamiento por plomo en los niños provoca, entre otras cosas, deficiencias en el coeficiente intelectual, incapacidad de lectura y aprendizaje, deterioro de la audición, déficit de atención, hiperactividad y problemas de comportamiento. Asimismo, se encontró que en los niños la causa más común de este tipo de envenenamiento era ingerir polvo de pintura a base de plomo deteriorada o desgastada en sus hogares. See. 1002 del Título X, 42 U.S.C.A. see. 4851.

 Para fines del referido estatuto, target housing se define, en lo aquí pertinente, de la manera siguiente:
“The term ‘target housing” means any housing constructed prior to 1978, except housing for the elderly or persons with disabilities (unless any child who is less them 6 years of age resides or is expected to reside in such housing for the elderly or persons with disabilities) or any 0-bedroom dwelling.” 42 U.S.C.A. sec. 4851b(27). Véanse: 24 CFR sec. 35.86; 40 CFR sec. 745.103.

 De igual forma, se excluyeron de cumplir con los requisitos de esta legislación ciertas transacciones aun cuando estuviesen involucradas propiedades construidas antes de 1978. A esos efectos, se excluyeron: (1) las transacciones de ventas de propiedades en ejecuciones de hipoteca; (2) arrendamientos de residencias que estuviesen, según determinado por un inspector, libres de pintura a base de plomo; (3) arrendamientos de 100 días o menos, donde no pudiese ocurrir una renovación o extensión en el contrato; (4) renovación de arrendamientos, en los cuales se ha divulgado la información anteriormente y ninguna información nueva ha entrado en posesión del arrendador; (5) compra, venta o servicio de hipotecas; (6) venta o arrendamiento de viviendas de 0 cuatros, y (7) acuerdos informales de alquiler. 24 CFR see. 35.82; 40 CFR see. 745.101; Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9066-68. Véase, además: C.E. Walker, The Lead-Based Paint Real Estate Notification and *125 Disclosure Rule, 8 Buff. Envtl. L.J. 65, 79-80 (2000); J.P. Fensler y L.A. Bernstein, Lead Poisoning at Home: New Federal Disclosure Duties, ante, pág. 16; N.M. Kublicki, Heavy metal: Residential Lead Rule, 10 Prob. & Prob. 38, 40 (septiembreoctubre 1996).

 Conforme a lo anterior, nos referiremos a la persona que desea comprar una propiedad construida antes de Í978 como prospecto comprador, ello en vista de que el aludido estatuto ordena que la divulgación de la información requerida se lleve a cabo antes de que éste se encuentre contractualmente obligado con el vendedor. Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9071.

 Dicho panfleto de la EPA se titula “Proteja a su Familia contra el Plomo en el Hogar”.

 Vale la pena señalar que, aun cuando, en términos generales, esta ley impuso la obligación a todo vendedor de una propiedad construida antes de 1978 de divulgar cierta información que fuera de su conocimiento con respecto a la existencia de pintura a base de plomo o de sus peligros en su propiedad, no impuso una obligación afirmativa de llevar a cabo una inspección de la propiedad o de llevar a cabo una actividad de reducción o eliminación de la exposición a los peligros de la pintura a base de plomo. Fensler y Bernstein, ante, pág. Í5; K.A. Pancak et al., Legal Duties of Property Owners Under Lead-Based Paint Laws, 24 Real Est. L.J. 7, 8 (1995); Kublicki, ante, pág. 40; R. Reibstein, The Significance of the Federal Residential Lead-Based Paint Regulations, 30 -SUM VT. B.J. 3, 44 (2004).
Ahora bien, es de notar que si el dueño de una propiedad desea remover la pintura a base de plomo tiene que contratar a una persona certificada para ello. En específico, la Junta de Calidad Ambiental en Puerto Rico es la agencia encargada de otorgar los permisos y certificaciones en el campo de la remoción de la pintura a base de plomo.

 Dicho estatuto define el término agente de la manera siguiente:
“Agent means any party who enters into contract with a seller or lessor, including any party who enters into a contract with a representative of the seller or lessor, for the purpose of selling or leasing target housing. This term does not apply to purchasers or any purchaser’s representative who receives all compensation from the purchaser.” 24 CFR sec. 35.86; 40 CFR sec. 745.103.
Conforme a esta definición, son considerados agentes para fines del antes mencionado estatuto •—por lo cual están obligados a cumplir con la reglamentación de divulgación federal— todo corredor o vendedor de bienes raíces que enliste una propiedad, que ofrezca una propiedad para su venta o alquiler, o aquel corredor de bienes raíces del comprador (si recibe su compensación del vendedor o a través de un acuerdo de cooperación con el agente que enlistó la propiedad). Ahora bien, un agente del comprador que recibe toda su compensación del comprador no se considera agente para los efectos de esta legislación. Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01, 9067.

 En el estatuto expresamente se estableció cuál sería el contenido de dicha declaración. A esos efectos se estableció, en lo aquí pertinente, lo siguiente:
“The Lead Warning Statement shall contain the following text printed in large type on a separate sheet of paper attached to the contract:
“ ‘Every purchaser of any interest in residential real property on which a residential dwelling was built prior to 1978 is notified that such property may present exposure to lead from lead-based paint that may place young children at risk of developing lead poisoning. Lead poisoning in young children may produce permanent neurological damage, including learning disabilities, reduced intelligence quotient, behavioral problems, and impaired memory. Lead poisoning also poses a particular risk to pregnant women. The seller of any interest in residential real property is required to provide the buyer with any information on lead-based paint hazards from risk assessments or inspections in the seller’s possession and notify the buyer of any known lead-based paint hazards. A risk assessment or inspection for possible lead-based paint hazards is recommended prior to purchase.’ ” 42 U.S.C.A. sec. 4852d(a)(3).

 Lead; Requirements for Disclosure of Known Lead-Based Paint and lor Lead-Based Paint Hazard in Housing, 61 FR 9064^01.

 Esta regla fue promulgada el 6 de marzo de 1996. Específicamente, dicha reglamentación comenzó a regir en fechas distintas, dependiendo de cuántas propiedades residenciales poseyeran los dueños; a saber, si poseía más de cuatro unidades comenzó a regir el 6 de septiembre de 1996, y si poseía entre una a cuatro comenzó a regir el 6 de diciembre de 1996. 24 CFR see. 35.84; 40 CFR see. 745.102. Véase, además, Walker, ante, pág. 76; Fensler y Bernstein, ante, pág. 16; Kublicki, ante, pág. 16.

 Como parte de la regulación conjunta, la EPA y la HUD ofrecieron un modelo de cómo debía ser el documento anejado a todo contrato de compraventa de una propiedad construida antes de 1978. Lead; Requirements for Disclosure of Known Lead-Based Paint and/or Lead-Based Paint Hazard in Housing, 61 FR 9064-01. El referido formulario lee como sigue:

“Declaración sobre los Peligros del Plomo

Se notifica a todo comprador de cualquier interés en propiedad real residencial en la cual fue construida una vivienda residencial antes del año 1978, que dicha propiedad puede presentar una exposición a plomo de la pintura a base de plomo que podría poner a niños jóvenes en situación de riesgo de desarrollar envenenamiento de plomo. El envenenamiento de plomo en niños jóvenes puede producir daños neurológicos permanentes, incluyendo incapacidad para el aprendizaje, cociente de inteligencia reducido, problemas de comportamiento y memoria dañada. El envenenamiento de plomo también representa un peligro especial para las mujeres *131 embarazadas. El vendedor (arrendador) de cualquier interés en una propiedad privada real residencial tiene la obligación de proporcionarle al comprador (arrendatario) toda la información que posea sobre los peligros de la pintura a base de plomo que se hayan determinado en evaluaciones o inspecciones de riesgo y de notificarle al comprador (arrendatario) sobre cualquier sobre cualquier peligro que conozca de la pintura a base de plomo antes de la compra.

Declaración del Vendedor

(a)Presencia de pintura a base de plomo y/o peligros e pintura a base de plomo (marque (i) ó (ii) abajo):
(i) _ Confirmado que hay pintura a base de plomo y/o peligro de pintura a base de plomo en la vivienda. (Explique).
(ii) _ El vendedor no tiene ningún conocimiento de que haya pintura a base de plomo y/o peligro de pintura a base de plomo en la vivienda.
(b)Archivos e informes disponibles para el vendedor (marque (i) ó (ii) abajo):
(i) _ El vendedor le ha proporcionado al comprador todos los archivos e informes disponibles relacionados con pintura a base de plomo y/o peligro de pintura a base de plomo en la vivienda. (Anote documentos abajo).
(ii) _ El vendedor no tiene archivos ni informes relacionados con pintura a base de plomo y/o peligros de pintura a base de plomo en la vivienda.

Acuse de Recibo del Comprador (Inicial)

(c) _ El comprador ha recibido copias de toda la información indicada arriba.
(d) _ El comprador ha recibido el folleto titulado Proteja a Su Familia del Plomo en Su Casa.
(e) El comprador ha (marque (i) ó (ii) abajo):
(i) _recibido una oportunidad por 10 días (o un período de tiempo de mutuo acuerdo) para hacer una evaluación o inspección de riesgo de presencia de pintura a base de plomo o de peligros de pintura a base de plomo; o
(ii) _renunciado a la oportunidad de hacer una evaluación o inspección de riesgo de presencia de pintura a base de plomo o de peligros de pintura a base de plomo.

Acuse de Recibo del Agente (Inicial)

(f) El agente le ha informado al vendedor de las obligaciones de acuerdo con 42 U.S.C. § 4852d y está consciente de su responsabilidad de asegurar su cumplimiento.

Certificación de Exactitud

Las partes siguientes han revisado la información que aparece arriba y certifican que, según su entender, toda la información que han proporcionado es verdadera y exacta.
Vendedor Fecha Comprador Fecha
Agente Fecha’

 Es preciso indicar que el presente asunto se originó en la órbita de nuestra jurisdicción disciplinaria, no en la judicial. En vista de ello, no nos corresponde en esta ocasión dilucidar, como solicitaron los quejosos, si el corredor de bienes raíces en este caso incurrió en violaciones a la Ley para la Reducción de los Riesgos Provocados por la Pintura a base de Plomo en Viviendas Residenciales de 1992.